# State of Vermont v. Gardner Carpenter

[412 A.2d 285]

No. 163-78

Present: Barney, C.J., Larrow, Billings and Hill, JJ., and Smith, J. (Ret.), Specially Assigned

Opinion Filed February 5, 1980

*M. Jerome Diamond,* Attorney General, and *Richard A. Unger,* Assistant Attorney General, Montpelier, for Plaintiff.

*James L. Morse,* Defender General, and *William A. Nelson,* Appellate Defender, Montpelier, for Defendant.

**Barney, C.J.** This is a criminal prosecution in which the State has taken an interlocutory appeal under V.R.A.P. 5(b). The trial judge proposed to grant a motion by the defendant to dismiss the prosecution. The ground for the dismissal, and the principal question stated as controlling, concerns the constitutionality of the statute upon which the prosecution is based, 21 V.S.A. § 345. It reads:

> Each employer who violates sections 342 and 343 of this title and the officers of any corporation, cooperative or stock association, who fraudulently permit their corporation, or cooperative association to violate these sections, shall be fined not more than $500.00 or imprisoned not more than one year or both. Upon conviction, the court shall make an order requiring the payment of wages due and not paid.

Sections 342 and 343 require persons who have employees doing business in the state to pay them weekly by cash or check.

The defendant was charged with 28 counts of nonpayment of wages. He was the owner and operator of a dress manufacturing business. The unpaid wages amount to $1800.00. The defendant had indicated to the wage investigator for the Department of Labor and Industry that he did not have the money to pay the wages due.

The constitutional point raised is an equal protection issue. It questions the rationality of the distinction made by the statute between employers, who are held strictly liable for nonpayment of wages, and corporate officers, who are held liable only for fraudulent nonpayment.

 The other controlling question stated relates to the construction of the statute in the face of constitutional attack. It is argued that if equal protection threatens to invalidate the statute, this Court should read into the criminal enactment the requirement that the prosecution prove the same fraudulent intent called for in the case of corporate officers. In this case such an alteration would be particularly inappropriate.

In 21 V.S.A. § 345a, the section following the statute in question here, the legislature did two things. First, in a wage setting involving a written agreement, it applied the test of fraudulent nonpayment to employers. Second, it provided that where the employer is a corporation the president and officers having control of funds are to be considered "employers" for the purpose of assigning criminal responsibility and penalty (which includes imprisonment).

It can only be said, in the presence of such particular language, that the legislature deliberately differentiated between the proofs required in these related offenses. For this Court to alter the standard of liability would most assuredly be in conflict with intentional legislative purpose. This is not a case of inadvertence or lack of clarity, or even statutory conflict. That being so, we must rule upon the statute as the legislature deliberately framed it. *In re Lampman*, 135 Vt. 226, 228, 373 A.2d 547, 548 (1977); *State* v. *Cattanach*, 129 Vt. 57, 60, 271 A.2d 828, 829–30 (1970). The constitutional conflict cannot be interpreted away.

The State, as appellant, contends that there is a supportable statutory basis for classifying employers differently from corporate officers. It denominates the statute as public welfare legislation and points out that it is entitled to the presumption of constitutionality. *Re Montpelier & Barre R.R.*, 135 Vt. 102, 103–04, 369 A.2d 1379, 1380 (1977).

It has not been argued, nor do we think it could be argued, that the proper equal protection analysis to be applied to this case is other than the traditional test which asks whether a

rational basis serving a legitimate public policy objective can be articulated in defense of the challenged statutory classification. L. Tribe, American Constitutional Law § 16-2 (1978).

Indeed, such a rational basis can be articulated to support the different treatment accorded to employers and corporate officers under 21 V.S.A. § 345. The intent of the statute is to foster the regular payment of wages to employees. It seeks to achieve this end by penalizing nonpayment. The penalties are imposed on employers strictly; that is, without regard for the employer's mental state at the time of the failure. It carves out an exception for corporate officers who fail to pay, but whose failure is without fraudulent intent. The exception recognizes an existing distinction between the two classes. Employers, be they sole proprietors or corporations, are by definition the captains of their own ships. It is true that such businessmen may find themselves unable to meet a payroll due to decisions that have already passed from their hands. Still, at one time or another employers have the authority, as well as the statutory responsibility, to make those decisions in such a way as to insure that workers do not labor without timely compensation.

Corporate officers are not always similarly situated. They are, after all, technically but a class of agents, whose authority finds its source and its limitations in a board of directors. 11 V.S.A. §§ 1892, 1895. Though they may, as a practical matter, frequently be invested with substantial discretion and authority, it does not invariably follow that the officers who are responsible for the payment of wages (and who are therefore in a position from which violation of 21 V.S.A. § 345 is possible) are the same individuals who make the decisions which determine a corporation's ability to pay its employees. Cf. *People* v. *D. H. Ahrend Co.*, 308 N.Y. 112, 123 N.E.2d 799 (1954) (per curiam) (purpose of a similar distinction in what was then Penal Law § 1272 was to exculpate nominal officers and others not actually aware of corporate affairs).

Undoubtedly this statutory distinction does not perfectly serve the purpose for which it was established. Certainly, it may exclude from its strict liability provisions, and thereby may eventually exculpate, some corporate officers who lack fraudulent intent but who are as culpable as the employers

144

that the statute inculpates. But the Fourteenth Amendment does not require that statutory distinctions be perfect to be sustained, only that they be rational. *Dandridge* v. *Williams,* 397 U.S. 471, 485 (1970). We need not conclude that as legislators we would adopt this statutory distinction in order to determine that, as jurists, we must sustain it.

The defendant further argues that the motion to dismiss was properly granted because, applied as a strict liability statute, 21 V.S.A. § 345 violates Chapter II, § 40 of the Vermont Constitution, which prohibits imprisonment for debt. The State contends that the issue is not properly before this Court since the issue was not certified by the trial court.

The idea that the scope of interlocutory review is limited to the issues certified is in large measure the legacy of our procedure before the 1971 promulgation of our present appellate rules. Under the old law such a limitation was strictly applied. *Central Vermont Medical Center* v. *Town of Plainfield,* 128 Vt. 557, 559, 268 A.2d 788, 789 (1970); *In re Crescent Beach Association,* 126 Vt. 448, 453, 236 A.2d 497, 500 (1967); *Dresden School District* v. *Norwich Town School District,* 124 Vt. 227, 230, 203 A.2d 598, 600 (1964).

But V.R.A.P. 5(b) does not refer to the older concept of certified questions. It speaks instead of "a controlling question of law," and we have interpreted the rule to require that the question be set out in the order. *Lyon* v. *Bennington College Corp.,* 137 Vt. 135, 136, 400 A.2d 1010, 1011 (1979). Controlling questions of law under 5(b) have frequently been referred to as certified questions. E.g., *Committee to Save the Bishop's House* v. *Medical Center Hospital of Vermont, Inc.,* 136 Vt. 213, 388 A.2d 827 (1978); *Richard* v. *Richard,* 131 Vt. 98, 99, 300 A.2d 637, 638 (1973).

V.R.A.P. 5(b) should not be allowed, by inadvertence, to become bound by the strictures of our prior law on certified questions. The considerations supporting those limitations could be more persuasively argued for interlocutory appeals under 5(a). That Rule contemplates the possibility of appeal at any stage in proceedings before the final judgment where the disposition of a legal issue would in at least one alternative determine an action. Because the procedural setting of such an appeal does not inherently limit the issues to be reviewed in this Court, there may be some need for such restraints on

the scope of appeal. Yet even under 5(a) we have not continued the former limitation to certified questions. Reporter's Notes, V.R.A.P. 5 (main volume, 1971).

No similar need for an external limitation on the scope of review exists as to appeals taken under 5(b). The Rule provides that such an appeal may only be taken from "an interlocutory order or ruling." The scope of review is thereby limited to those issues necessary to determine the validity of the order or ruling from which appeal is taken. If the law were otherwise we would be left in the anomalous position of affirming orders riddled with prejudicial error where the error was not within the scope of the question certified. Judicial economy would not be served. Cf. *Sexton* v. *Greer*, 135 Vt. 343, 345, 376 A.2d 750, 751 (1977) (a correct decision will be affirmed even where based on erroneous reasoning).

V.R.A.P. 5(b) was based on 28 U.S.C. § 1292(b) and F.R.A.P. 5. Reporter's Notes, V.R.A.P. 5 (main volume, 1971). The federal courts, operating under those provisions, are not limited to certified questions. *Bersch* v. *Drexel Firestone, Inc.*, 519 F.2d 974, 994–95 (2d Cir. 1975) ; 16 C. Wright, A. Miller, E. Cooper, & E. Gressman, Federal Practice and Procedure § 3929, at 143–45 (1977). Nor were they so limited when our rule was promulgated. *Nedd* v. *United Mine Workers of America*, 400 F.2d 103, 104 (3d Cir. 1968).

The authority relied on by the State is not to the contrary. *Central Vermont Medical Center* v. *Town of Plainfield*, supra, 128 Vt. 557, 268 A.2d 788; *State* v. *Duranleau*, 128 Vt. 206, 260 A.2d 383 (1969); *State* v. *Mahoney*, 126 Vt. 258, 227 A.2d 401 (1967); and *Dresden School District* v. *Norwich Town School District*, supra, 124 Vt. 227, 203 A.2d 598, precede the adoption of Rule 5(b) and therefore can hardly be said to interpret it. So did the grant of permission to appeal in *State* v. *Alexander*, 130 Vt. 54, 286 A.2d 262 (1971).

*Brown* v. *Tatro*, 134 Vt. 248, 356 A.2d 512 (1976), could be read as some support for the State's position. But we did not there refuse to reach a question for lack of certification. We merely declined to rephrase the issues certified. The distinction between the appellant's choice of words and those selected by the trial court was not material to the decision. It should not be thought that by refusing to quibble over a point

which did not affect the outcome of the appeal we foreclosed consideration in later cases of questions fairly raised by a trial court ruling but not stated in its order granting permission to appeal.

We conclude that under V.R.A.P. 5(b) the statement of the controlling question of law required by *Lyon* v. *Bennington College Corp., supra,* is for the aid of the Court and the parties in identifying the issues presented without limiting consideration to the trial judge's view of the case. It is a landmark, not a boundary, and this Court will not hesitate to reach issues outside its scope where they are fairly raised by the order appealed. Cf. *Hislop* v. *Department of Social Welfare,* 136 Vt. 205, 207, 388 A.2d 428, 429 (1978) (similar rule applied to appeals from administrative agency determinations, absent contrary statutory constraint).

The validity of 21 V.S.A. § 345 under Chapter II, § 40 of the Vermont Constitution is such an issue and we will decide it. To do otherwise would, in all probability, burden the parties with the necessity of pursuing successive appeals.

To support its contention that the statute does not constitute imprisonment for debt, the State relies heavily on *State* v. *Feist,* 115 R.I. 201, 341 A.2d 725 (1975). The Rhode Island Supreme Court upheld that state's wage payment statute against attack under Article I, § 11[1] of the state constitution. That provision of the Rhode Island Constitution is almost identical in language to the imprisonment for debt clause of our own Chapter II, § 40.[2] But *Feist* rests explicitly on the apparent legislative intent of their wage payment statute to promote the social and economic welfare of the community at large and the absence of any private compensatory objective. In this important respect the reasoning of *Feist* is inapplicable to the case at bar. It is manifest that, in part, our statute serves the same public policy objective as that pur-

---

[1] The person of a debtor, when there is not strong presumption of fraud, ought not to be continued in prison, after he shall have delivered up his property for the benefit of his creditors, in such manner as shall be prescribed by law.

[2] The person of a debtor, where there is not strong presumption of fraud, shall not be continued in prison after his delivering up and assigning over, *bona fide,* all his estate, real and personal, in possession, reversion or remainder, for the use of his creditors, in such manner as shall be regulated by law. . . .

sued by the Rhode Island statute: the protection of the community at large from economic disruption and hardship. But in contrast to the situation faced by Rhode Island's court, our statute does not serve only that purpose. 21 V.S.A. § 345 contains an unusual provision which requires that the trial court upon conviction for a violation of the statute enter an order requiring payment of wages due. It is, therefore, not only a shield for the protection of the commonweal, but a club with which individual compensation is coerced. To that extent it bears the character of a private debt collection device.

*State* v. *Feist, supra,* is also distinguishable from our case based on an additional significant variation between the statutes at issue. R.I. Gen. Laws § 28-14-2 (1968 Reenactment) is not truly a strict liability wage payment statute. It is not violated where nonpayment is "prevented by inevitable casualty." *Id.* 21 V.S.A. § 345 contains no such escape clause.

For these reasons, our analysis of this problem is not far advanced by the reasoning of *State* v. *Feist, supra.* Our case presents a far more difficult issue than that faced by the Rhode Island court.

The remaining cases cited by the State in support of its position, *Borderland Construction Co.* v. *State,* 49 Ariz. 523, 68 P.2d 207 (1937) ; *Department of Labor and Industry* v. *Rosen,* 44 N.J. Super. 42, 129 A.2d 588 (App. Div. 1957) ; *People* v. *Vetri,* 309 N.Y. 401, 131 N.E.2d 568 (1955); *People* v. *Primrose Wet Wash Laundry Co.,* 256 App. Div. 1088, 11 N.Y.S.2d 302 (1939) ; and *People* v. *Lustig,* 94 Misc. 2d 669, 405 N.Y.S.2d 232 (Crim. Ct. N.Y. Co. 1978), are wholly unpersuasive since none of them reach or discuss imprisonment for debt.

As our earlier discussion of the statute makes clear, this is not an instance in which the "strong presumption of fraud" exception to Chapter II, § 40 can save the statute. Neither fraud nor any other intent is an element of the crime as applied to sole proprietors like the defendant. Nor does the possibility of absolution through insolvency proceedings ameliorate the effect of the statute in these circumstances. Although a discharge in bankruptcy might nullify the compensation clause in the statute (by rendering unpaid wages no longer "due"), a current debt for unpaid wages is not an element of the crime. Rather, the statute is violated when wages earned

148

are not paid within the required periods. 21 V.S.A. § 342. A subsequent discharge neither negates this element nor protects an employer from the penalty of imprisonment.

■ Our statute is comparable in impact to that which was struck down in *Makarov* v. *Commonwealth*, 217 Va. 381, 228 S.E.2d 573 (1976). It subjects employers to possible imprisonment solely for a failure to make a timely wage payment; "in effect, it permits detention for the mere failure to pay a contract debt." *Id.* at 385, 228 S.E.2d at 575. It is the mere indebtedness, not culpable intent, which triggers the penalty. This is indeed imprisonment for debt, Smith, *The Constitutionality of Bimonthly Pay Day Laws*, 16 Tenn. L. Rev. 940, 944, 950–51 (1941), a long forbidden anachronism, *Randall* v. *Randall*, 129 Vt. 432, 435, 282 A.2d 794, 796 (1971), which this Court can not countenance.

■ But we are not inexorably led by this conclusion to agree with the defendant's contention that the trial court's proposed dismissal is therefore correct. Even where a legislative act is in part invalid, we are obligated to give effect to its other valid portions. 1 V.S.A. § 215; *Veilleux* v. *Springer*, 131 Vt. 33, 41–42, 300 A.2d 620, 625–26 (1973). Though the penalty of imprisonment imposed by 21 V.S.A. § 345 on employers is unenforcible because in conflict with Vt. Const. ch. II, § 40, we are not ready to conclude that all the penalties imposed by that statute are invalid. Although it could be argued that under 13 V.S.A. § 7223 a fine is the equivalent of a sentence of imprisonment, see Smith, *supra,* at 944 n.13, we think the question is open to some doubt. Compare *Spabile* v. *Hunt,* 134 Vt. 332, 360 A.2d 51 (1976), with *Tate* v. *Short,* 401 U.S. 395 (1971). As the question has not been briefed or argued, it must await proper presentation before us at another time if it is to be definitively answered.

*Reversed and remanded for further proceedings consistent with the views expressed herein.*