NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2021 VT 10

No. 2019-266

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Bennington Unit, |
| | Criminal Division |
| | |
| Max Misch | June Term, 2020 |

William D. Cohen, J.

Thomas J. Donovan, Jr., Attorney General, Benjamin D. Battles, Solicitor General, and
  Ultan Doyle, David Boyd, and Eleanor L.P. Spottswood, Assistant Attorneys General,
  Montpelier, for Plaintiff-Appellant.

Matthew Valerio, Defender General, Rebecca Turner, Appellate Defender, and Carly Orozco,
  Law Clerk (On the Brief), Montpelier, for Defendant-Appellee.

David J. Haber, Unaffiliated Private Citizen, Burlington, Amicus Curiae.

Tristram J. Coffin, Jennifer McDonald and William T. Clark of Downs Rachlin Martin, PLLC,
  Burlington, Bridget C. Asay and Michael Donofrio of Stris & Maher LLP, Montpelier, J. Adam
  Skaggs of Giffords Law Center to Prevent Gun Violence, New York, New York, and Hannah
  Shearer of Giffords Law Center to Prevent Gun Violence, San Francisco, California, for Amici
  Curiae Giffords Law Center, Vermont Medical Society, and Gun Sense Vermont.

Jonathan T. Rose of Dunkiel Saunders Elliott Raubvogel & Hand, PLLC, Burlington, Karl A.
  Racine, Attorney General for the District of Columbia, Loren L. Alikhan, Solicitor General,
  Caroline S. Van Zile, Deputy Solicitor General, and Sonya L. Lebsack, Assistant Attorney
  General, Washington, DC, for Amici Curiae District of Columbia, California, Connecticut,
  Delaware, Hawaii, Illinois, Maryland, Massachusetts, Michigan, Minnesota, New Jersey,
  New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Virginia, and Washington.

O. Whitman Smith of Mickenberg, Dunn, Lachs & Smith, PLC, Burlington, and Eric Tirschwell,
  William J. Taylor, Jr., and Mark Anthony Frassetto of Everytown Law (On the Brief), New York,
  New York, for Amicus Curiae Everytown for Gun Safety Support Fund.

Stephen Coteus of Tarrant, Gillies & Richardson, Montpelier, Jonathan E. Lowy and
  Kelly Sampson of Brady, Washington, DC, Mark D. Selwyn, Arthur W. Coviello, and
  Kevin O'Brien of Wilmerhale LLP, Palo Alto, California, Lauren Fletcher of Wilmerhale LLP,
  Boston, Massachusetts, and Jon C. Weingart of Wilmerhale LLP, Washington, DC, for Amici
  Curiae Brady and Brady Vermont.

Ethan A Fenn, Law Office of Ethan A. Fenn, PLC, Burlington, Joseph G.S. Greenlee of Firearms
  Policy Coalition, Sacramento, California, David B. Kopel of Independence Institute, Denver,
  Colorado, and Ilya Shapiro and Trevor Burrus of Cato Institute, Washington, DC, for Amici
  Curiae Cato Institute, Firearms Policy Coalition, Firearms Policy Foundation, and Independence
  Institute.

Clark Bensen of Polidata LLC, Corinth, and David H. Thompson and Peter A. Patterson of Cooper
  & Kirk PLLC, Washington, DC, for Amicus Curiae Robert Kalinowski Jr.


PRESENT:  Robinson, Eaton[1] and Carroll, JJ., Wesley and Pearson Supr. JJ. (Ret.),
          Specially Assigned


¶ 1.     **PER CURIAM.**  This case requires us to decide whether Vermont's ban on large-capacity magazines (LCMs), 13 V.S.A. § 4021(a), violates the right to bear arms under Chapter I, Article 16 of the Vermont Constitution.[2]  We conclude that the magazine ban is a reasonable regulation of the right of the people to bear arms for self-defense, and therefore affirm the trial court's denial of defendant's motion to dismiss the charges against him for allegedly violating § 4021(a).

¶ 2.     Defendant was charged under 13 V.S.A. § 4021(a) with two counts of unlawfully possessing a large-capacity magazine.  Section 4021 states, "[a] person shall not manufacture,

---

[1]  Justice Eaton was present for oral argument but did not participate in this decision.

[2]  In a separate appeal from the Vermont Superior Court, Washington Unit, Civil Division, appellants Vermont Federation of Sportsmen's Clubs; Vermont State Rifle & Pistol Association, Inc.; Powderhorn Outdoor Sports Center, Inc.; John Fogarty; and Samuel Frank, challenged the constitutionality of 13 V.S.A. § 4021.  This opinion addresses arguments raised in that appeal to the extent that they differ from those raised in this case, and we have decided that case in its own docket today in a published entry order.  See Vt. Fed'n of Sportsmen's Clubs v. Birmingham, 2021 VT 11, __ Vt. __, __ A.3d __ (mem.).

possess, transfer, offer for sale, purchase, receive or import into this State a large capacity ammunition feeding device," defined as:

> a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept . . . more than 10 rounds of ammunition for a long gun; or . . . more than 15 rounds of ammunition for a hand gun.

Id. § 4021(a), (e)(1). Defendant allegedly traveled to a New Hampshire retailer, purchased two thirty-round magazines for a rifle, and transported them back into Vermont. Defendant moved to dismiss the charges on the grounds that the statute unconstitutionally impinges on the right to bear arms in Article 16 and that the grandfather provision of § 4021 violates the Common Benefits Clause of Chapter I, Article 7 of the Vermont Constitution by treating differently people who possessed large-capacity magazines before April 11, 2018, and those who acquire large-capacity magazines after that date. See id. § 4021(c)(1) (stating that prohibition shall not apply to devices lawfully possessed on or before statute's effective date).

¶ 3. In June 2019, the trial court denied defendant's motion to dismiss. The court described the two most common tests for determining the constitutionality of gun-control statutes in other jurisdictions: the "reasonableness test" used by the majority of states, and the two-prong test used by most federal circuit courts. The court concluded that § 4021 satisfies both tests. It also rejected defendant's argument under the Common Benefits Clause, reasoning that "[t]he grandfather provision allowed the Legislature to gradually curtail the availability of large-capacity magazines while lessening the burden on individuals that already possessed these devi[c]es," and that differential treatment based on the time a person acquired magazines "bears a reasonable and just relation to the governmental purpose of protecting the public from gun violence."

¶ 4. The trial court subsequently granted the parties' joint motion for appeal on report by agreement pursuant to Vermont Rule of Appellate Procedure 5(a)(1), reporting two questions of law: whether § 4021 violates Chapter I, Article 16, and whether it violates Chapter I, Article 7.

3

We accepted the appeal. The constitutionality of § 4021 is a pure question of law, which we review without deference to the trial court.[3] See In re MVP Health Ins. Co., 2016 VT 111, ¶ 10, 203 Vt. 274, 155 A.3d 1207.

¶ 5. On appeal, the State argues that Article 16 establishes a limited right to bear arms in self-defense, urges the Court to adopt the "reasonable regulation" standard used by most other states to evaluate the constitutionality of regulations impacting the right to bear arms, and contends that regardless of the standard applied, § 4021 does not violate Article 16.[4] Defendant argues that the right to bear arms under Article 16 is "express and without limitation," that the statute "runs counter to the express requirements of the Vermont Constitution," and that we should therefore presume it to be unconstitutional.

¶ 6. With respect to the Common Benefits Clause, on appeal defendant argues for the first time that § 4021 violates Article 7 because it exempts large-capacity magazines transferred to or possessed by government agencies and current and retired law-enforcement officers, thus giving preferential treatment to government officials over other groups. See 13 V.S.A. § 4021(d)(1)(A), (B), (D) (creating exceptions to prohibition of LCMs). Defendant does not pursue his argument that the grandfather exemption violates the Common Benefits Clause. In its reply brief, the State argues that defendant has waived his appeal as it relates to the grandfather clause, and that he failed to preserve his new claim relating to government officials.

---

[3] The constitutional issues in this case are based only on Article 16 and the Common Benefits Clause of the Vermont Constitution. Defendant raises no claim under the Second Amendment or Equal Protection Clause of the United States Constitution. The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Equal Protection Clause prohibits states from making laws that deny any person "equal protection of the law." U.S. Const. amend. XIV. The federal case law referenced in this opinion is cited as persuasive authority only.

[4] Pursuant to Appellate Rule 5(a)(3), the State is treated as the appellant in criminal actions appealed on report by agreement.

¶ 7.    We first determine that Article 16 protects a limited right to individual self-defense, and that the proper standard for Article 16 challenges is a reasonable-regulation test. Under this test, we will uphold a statute implicating the right to bear arms provided it is a reasonable exercise of the State's power to protect the public safety and welfare. Applying this standard, we conclude that § 4021 satisfies the reasonable-regulation test because the statute has a valid purpose of reducing the lethality of mass shootings, the Legislature was within its authority in concluding that the regulation promotes this purpose, and the statute leaves ample means for Vermonters to exercise their right to bear arms in self-defense.[5]

---

[5] We do not address defendant's Common Benefits Clause arguments. Because defendant did not challenge the constitutionality of the grandfather clause in his brief on appeal, we do not address it here. See State v. Godfrey, 2010 VT 29, ¶ 27, 187 Vt. 495, 996 A.2d 237 (noting that challenges raised at trial level but not briefed on appeal are generally waived). While the State briefed the grandfather-clause issue in its opening brief, it did not challenge the provision. See In re D.C., 2016 VT 72, ¶ 5 n.1, 202 Vt. 340, 149 A.3d 466 (declining to reach waived issue even though it was briefed by opposing party).

We also do not address defendant's challenge to the statute's exceptions for governmental agencies and current or retired law enforcement officers because he did not raise the argument below, and we conclude that it was not within the intended scope of this appeal by agreement and report under Appellate Rule 5(a). "To properly preserve an issue for appeal a party must present the issue with specificity and clarity in a manner which gives the trial court a fair opportunity to rule on it." Zlotoff Found., Inc. v. Town of South Hero, 2020 VT 25, ¶ 33, __ Vt. __, 231 A.3d 1146 (quotation omitted). In his Common Benefits Clause argument before the trial court, defendant did not mention the governmental exceptions in 13 V.S.A. § 4021(d)(1) but focused entirely on the grandfather clause in § 4021(c)(1). It is true that in describing the legal issues for appeal, the trial court used the general phrasing, "Does 13 V.S.A. § 4021 violate Chapter I, Article 7 of the Vermont Constitution?" But we do not view this general phrasing as a request or authorization to address any and all Common Benefits Clause arguments, whether or not raised and addressed by the trial court. Moreover, the record is insufficient and the briefing inadequate to evaluate this argument. In particular, the record and argument concerning the bases for the challenged exemption are minimal, and defendant, having raised the argument for the first time in his appellee brief, has not briefed the question of severability in the event that this Court were to hold that one or more of the statute's exemptions run afoul of the Common Benefits Clause.

## I. Legal Framework Under Article 16

¶ 8.     Article 16 declares that "the people have a right to bear arms for the defence of themselves and the State."[6]  Vt. Const. ch. I, art. 16.  We have never defined the scope of the right to bear arms, nor have we set forth a standard to determine whether a law infringes upon that right. These are our first two tasks.

¶ 9.     When establishing a constitutional test, our goal is "to discover and protect the core value that gave life to" a constitutional provision, and "to give meaning to the text in light of contemporary experience."  State v. Kirchoff, 156 Vt. 1, 6, 587 A.2d 988, 992 (1991).  In doing so, we begin with the text of the provision, understood in its historical context, and we consider our own case law, the construction of similar provisions in other state constitutions, and empirical evidence if relevant.  See Baker v. State, 170 Vt. 194, 206, 744 A.2d 864, 873 (1999) (identifying factors Court typically relies on in construing Vermont Constitution); see also State v. Jewett, 146 Vt. 221, 225-27, 500 A.2d 233, 236-37 (1985) (identifying text of constitutional provision, history surrounding its adoption, decisions from other states interpreting similar constitutional provisions, and economic and sociological materials as tools for interpreting provisions in the Vermont Constitution).  With this guidance in mind, we consider the scope of the right to bear arms embodied in Article 16, and the proper test for evaluating the constitutionality of laws that potentially impinge on that right.

### A. Scope of Right to Bear Arms

¶ 10.     We conclude that Article 16 protects a right to bear arms in individual self-defense, subject to reasonable regulation.  The constitutional text, considered in the historical context surrounding its enactment, is inconclusive as to the full scope and purpose of the right.  To the

---

[6]  The quoted language here reflects the spelling of "defense" at the time the Constitution was drafted; however, we use the modern spelling, "defense," throughout the remainder of the opinion for consistency, except when quoting language from another state's constitution.

extent that Article 16 established a right to bear arms for the purpose of serving in a state militia, that aspect of the Article 16 right has no contemporary application. Considering the text alone, in light of its likely meaning at the time the Vermont Constitution was enacted, it is unclear whether Article 16 protected an individual's right to possess guns for self-defense outside of the context of actual or potential state militia service. Nevertheless, our case law has assumed that Article 16 protects such an individual right subject to reasonable regulation, and courts in most states and the United States Supreme Court have all construed similar provisions to establish a limited right to possess guns for individual self-defense. This right has never been understood as unlimited, as evidenced by case law as well as regulations of firearms throughout Vermont history. Given these considerations, we conclude that recognizing that Article 16 includes a limited right to bear arms in individual self-defense is the best way to "give meaning to the text in light of contemporary experience." Kirchoff, 156 Vt. at 6, 587 A.2d at 992. However, both our case law and the historical roots of Article 16 support an interpretation that allows for gun regulation in the interest of public safety.

## 1. Text

¶ 11. The full text of Article 16 provides:

> That the people have a right to bear arms for the defense of themselves and the State—and as standing armies in time of peace are dangerous to liberty, they ought not to be kept up; and that the military should be kept under strict subordination to and governed by the civil power.

Vt. Const. ch. I, art. 16.

¶ 12. "We approach interpretation of the [Vermont] Constitution differently than we do the interpretation of statutes." State v. Hance, 2006 VT 97, ¶ 10, 180 Vt. 357, 910 A.2d 874. We have often relied on historical context to "illuminate the meaning" of a constitutional provision. Id.; see also Daye v. State, 171 Vt. 475, 484, 769 A.2d 630, 638 (2000) ("Plaintiffs are well served . . . in seeking guidance from the historical and ideological forces surrounding the framing

7

of the constitutional provision at issue."). Historical context is "[o]ne of our most useful tools to determine the meaning of a constitutional provision," because the plain meaning of the right to bear arms as commonly understood today does not necessarily align with its plain meaning when it was written in 1777.[7] Chittenden Town Sch. Dist. v. Dep't of Educ., 169 Vt. 310, 327-28, 738 A.2d 539, 552 (1999) (noting that in trying to discern what language in constitution means, "we are trying to make the best sense we can of an historical event—someone, or a social group with particular responsibilities, speaking or writing in a particular way on a particular occasion" (quotation omitted)); cf. Turner v. Shumlin, 2017 VT 2, ¶ 25, 204 Vt. 78, 163 A.3d 1173 (per curiam) ("Notably, in this case we are not construing an ancient constitutional provision that would give us pause in applying the plain meaning of the provision's language without considering its historical context."). In determining that the language of Article 16 alone does not establish the contours of and limits to the right to bear arms, we consider the historical context generally, the contemporaneous meaning of the term "bear arms," and the reference in Article 16 to the right of "the people" to bear arms for the "defense of themselves and the State."

a. Historical Context

¶ 13. The historical context here is significant. Although the historical record contains scant evidence of public debate concerning the right of individuals to keep or carry weapons for nonmilitia purposes, the status and control of state militias and the desirability of a standing national army were hotly debated throughout the states during the era when Vermont's founders adopted the first Vermont Constitution. K. Ehrman & D. Henigan, The Second Amendment in the Twentieth Century: Have You Seen Your Militia Lately?, 15 U. Dayton L. Rev. 5, 14-34 (1989) (describing widespread debate concerning protection of state militias in state constitutions, the United States Constitution, and the federal Bill of Rights). The Virginia Declaration of Rights,

---

[7] The right to bear arms appeared in the 1777 Constitution at Article XV; the language of Article 16 of the 1793 Constitution—the current constitution—is essentially identical.

which was the oldest and most influential declaration of rights, stated that "a well-regulated Militia, composed of the body of the people, trained to arms, is the proper, natural and safe defence of a free State." Id. at 16-17 (quoting Va. Declaration of Rights of 1776, art. 13). It did not reference a specific right to "bear arms." Id. The Pennsylvania Constitution was influenced by the Virginia Constitution, and was the first to affirmatively declare a right to "bear arms" tied to "defense of themselves" in the context of a comparable provision. Id. (quoting Pa. Declaration of Rights of 1776, arts. VIII & XIII). Most of the remaining state constitutions drew from one or both of these constitutions; only four of the state constitutions adopted prior to the federal constitution included a right to "bear arms," and only two, including Vermont's, included a reference to "defense for themselves." Id. at 17. The Vermont Declaration of Rights incorporates the language from the Pennsylvania Constitution verbatim. Id. n.91; see also Chittenden Town Sch. Dist., 169 Vt. at 334, 738 A.2d at 556 (noting that much of Vermont's original constitutional language came from Pennsylvania's constitution).

¶ 14. Ehrman and Henigan summarized the historical record concerning these provisions as follows:

> [I]n none of the conventions, writings, or debates preceding the second amendment was there any discussion of a right to have weapons for hunting, target shooting, self-defense, or any other non-militia purpose. No such discussion appears in the Constitutional Convention records, the Anti-Federalist writings, Virginia's ratifying debates, state constitutions or declarations of the 1770s, or Congressional debates on the Bill of Rights.

Ehrman, supra, at 33. Instead, the debate underlying these various provisions, including the Second Amendment to the United States Constitution, arose from a "fear of standing armies in the hands of a powerful central government" that had "instilled in Americans a belief that a militia was the proper form of defense." Id. The goal animating these various provisions was to protect the ability of states to maintain effective state-regulated militias. Id. As Justice Stevens has explained, with reference to the Second Amendment to the United States Constitution,

9

The history of the adoption of the Amendment thus describes an overriding concern about the potential threat to state sovereignty that a federal standing army would pose, and a desire to protect the States' militias as the means by which to guard against that danger. But state militias could not effectively check the prospect of a federal standing army so long as Congress retained the power to disarm them, and so a guarantee against such disarmament was needed.

District of Columbia v. Heller, 554 U.S. 570, 661 (2008) (Stevens, J., dissenting). In this context, we consider the text of Article 16 more closely. In particular, we consider the meaning of the right to "bear arms for the defense of . . . the State," and the significance of the right of "the people" to bear arms "for the defense of themselves."[8] Vt. Const. ch. I, art. 16.

b. "Bear Arms for the defense of . . . the State"

¶ 15. The phrase "bear arms for the defense of . . . the State" by itself most likely meant, in the eighteenth century, to bear arms for the purpose of serving in a state militia. To the extent

_____

[8] We are mindful that the United States Supreme Court has interpreted the language of Article 16 of the Vermont Constitution to establish a right to individual self-defense that is independent of militia service. Heller, 554 U.S. at 584-85, 585 n.8. In Heller, the Supreme Court held that the Second Amendment of the United States Constitution protects the right to carry firearms for individual self-defense. Id. at 601. In doing so, the Court rejected the petitioners' and dissenting justices' arguments that the term "bear arms" in the Second Amendment connotes primarily service in a militia, holding instead that "bear arms" means literally to carry a firearm. Id. at 584. In support of its interpretation of "bear arms," the Court pointed to the Vermont Constitution. It reasoned that because Article 16 includes the phrase "for the defense of themselves," Vermont had "clearly adopted individual rights unconnected to militia service." Id. at 601; see also id. at 585 & n.8 (citing Article 16, among other state constitutional provisions, as one of the "most prominent examples" of the use of "bear arms" in the 18th and early 19th centuries).

We note that in interpreting our own Constitution, we are not bound by the Supreme Court's interpretation of the Second Amendment or its understanding of our Constitution. "We are a sovereign state," and in applying the Vermont Constitution, "this Court is entitled to take issue with any constitutional decision of the United States Supreme Court, regardless of whether our constitution provides the same or a different text." State v. Morris, 165 Vt. 111, 127, 680 A.2d 90, 101 (1996). The Vermont Constitution is "not a mere reflection of the federal charter," but "an independent authority, and Vermont's fundamental law." State v. Badger, 141 Vt. 430, 448-49, 450 A.2d 336, 347 (1982). And it is our responsibility alone to interpret the Vermont Constitution. Chittenden Town Sch. Dist., 169 Vt. at 319, 738 A.2d at 546; see also Michigan v. Long, 463 U.S. 1032, 1041 (1983) ("It is fundamental that state courts be left free and unfettered by us in interpreting their state constitutions." (quotation omitted)).

the right to bear arms is borne of and shaped by the purpose of ensuring a ready force to serve in the state militia, it does not apply in the modern context.

i. "Bear Arms"

¶ 16. Our understanding of the meaning of the constitutional right to "bear arms" in 2021 is necessarily informed by an understanding of the meaning of that term when Vermont's founders established the constitutional right, as reflected in general linguistic usage in the founding era as well as the specific terminology in the Vermont Constitution.

¶ 17. In recent years, Brigham Young University has released two databases—the Corpus of Founding Era American English, which contains over 120,000 texts, including legal writings, books, pamphlets, letters, and other documents dated between 1760 and 1799, and the Corpus of Early Modern English, which contains over 40,000 texts, including those published in England as well as the United States. D. Baron, Corpus Evidence Illuminates the Meaning of Bear Arms, 46 Hastings Const. L.Q. 509, 510 (2019); BYU Law & Corpus Linguistics, Corpus of Early Modern English (BYU-COEME) (last visited Jan. 8, 2021), https://lawncl.byu.edu/byucoeme/concordances; BYU Law & Corpus Linguistics, Corpus of Founding Era American English (COFEA) (last visited Jan. 8, 2021), https://lawcorpus.byu.edu/cofea/concordances/search. Analyzing these databases, occasionally alongside the Google Books database, several studies have reviewed hundreds of instances of "bear arms" and have found that the phrase was "overwhelmingly used in a collective or military sense." D. Miller, Owning Heller, 30 U. Fla. J.L. & Pub. Pol'y 153, 160-61 (2020) (emphasis omitted) (collecting studies); see also J. Jones, Comment: The "Weaponization" of Corpus Linguistics: Testing Heller's Linguistic Claims, 34 BYU J. Pub. L. 135, 161 (2020) (finding that "bear arms was used more often [though not overwhelmingly more often] in the 'figurative' specialized sense than the 'literal' carrying sense"); Baron, supra, at 511-12 (analyzing approximately 900 occurrences of the phrase "bear arms" before and during the founding era and

11

finding only seven that were either ambiguous or carried no military connotation); J. Blackman & J. Phillips, Corpus Linguistics and the Second Amendment, H.L. Rev. Blog (Aug. 7, 2018), https:// blog.harvardlawreview.org/corpus-linguistics-and-the-second-amendment/ [https://perma.cc/ 4SEV-GQAZ] (analyzing sample of fifty sources and finding "overwhelming majority" were in military context). While there was some contemporary use of the term "bear arms" in a literal or individualistic sense, corpus data has revealed that "bear arms" most often meant to serve in a military capacity. See also Heller, 554 U.S. at 646-47 (Stevens, J., dissenting) (citing 18th-century dictionary definitions of "bear arms").[9] Coupled with "for the defense of . . . the State," and in light of the history set forth above, the phrase relates to a right to bear arms as a necessary condition to service in a State militia.

¶ 18. This understanding is consistent with the context and use of "bear arms" and "bearing arms" in the Vermont Constitution. The phrase "bear arms" in the first clause of Article 16 refers at least in part to the "defense of . . . the State," and the latter two clauses of Article 16 clearly relate to the roles and power of the standing army and military. In this context, it makes sense to read "bear arms" as being connected to militia service. And Chapter I, Article 9, the other constitutional provision containing the phrase "bearing arms," uses the term to refer to the duty to bear arms in militia service. Article 9 contains a conscientious-objector clause: no person "who is conscientiously scrupulous of bearing arms" can "be justly compelled thereto." Vt. Const. ch. I, art. 9. Use of the phrase "bearing arms" in Article 9 to mean military service reinforces an inference that in Article 16 the phrase "bear arms" means to carry weapons in a military context. See State v. Lohr, 2020 VT 41, ¶ 7, __ Vt. __, 236 A.3d 1277 (noting that canons of statutory construction apply "more cautiously" when interpreting the Constitution, but relying on canon that

---

[9] We note that some of the more recent evidence of the public meaning of "bear arms" during the late eighteenth century that informs our analysis was not available to the United States Supreme Court when it decided Heller in 2011.

12

"we examine 'the whole and every part' of a [constitutional] provision, together with others governing the same subject matter, as parts of a system" (quotation omitted)); cf. Mosby v. Devine, 851 A.2d 1031, 1041-42 (R.I. 2004) (reasoning that reference to "bearing arms" in conscientious-objector provision "relates exclusively to military service," and concluding that "bear arms" in Rhode Island Constitution "relates to military service and the common defense").

¶ 19. On this view, the right to bear arms, while an individual right, was an individual right in service of a collective responsibility. Members of the militia generally provided their own weapons, and in Vermont, they were required to do so. P. Gillies, The Militia Governed by the Civil Power, 44-SPG Vt. B.J. 14, 15 (2018); see also Commonwealth v. Davis, 343 N.E.2d 847, 849 (Mass. 1976) ("Militiamen customarily furnished their own equipment and indeed might be under legal obligation to do so."). A law restricting possession of arms used in militia service "might then have interfered with the effectiveness of the militia and thus offended" the constitutional right to bear arms. Davis, 343 N.E.2d at 849. Based on the language of the Constitution and its historical context, the right to "bear arms for the defense of . . . the State" in Article 16 was most likely a right to bear arms for the purpose of service in the state militia.

ii. Modern Status of the State "Militia"

¶ 20. To the extent that a right to "bear arms" is tied to the purpose of preserving a state militia force, there is no modern predicate to application of the right. During the framers' era, while the militia was made up of civilians, not professionals, it was an organized body, functioning both as part of the government and as an independent force to protect the community. See Ehrman, supra, at 24 (stating that for purposes of Second Amendment, "even though the militias were composed of a large body of male citizens, the militias were seen as state units"). The militia was, as two scholars described, "a trained, organized, and armed collection of qualified males, save those of conscientious scruple and others exempted from service by their states, called together from their normal pursuits to respond to occasional and particular threats, internal or external, to

13

community peace." H. Uviller & W. Merkel, <u>The Second Amendment in Context: The Case of the Vanishing Predicate</u>, 76 Chi.-Kent L. Rev. 403, 598 (2000). Because militias were state-regulated, they also served as a state-based check on overreaching federal power. See Ehrman, <u>supra</u>, at 34-35 (noting that Second Amendment, among other things, ensured that federal government would not become overly oppressive and ensured states that they would have authority in federalist scheme); see also M. Driessen, <u>Private Organizations and the Militia Status: They Don't Make Militias Like They Used To</u>, 1998 B.Y.U. L. Rev. 1, 7-14 (1998) (identifying salient characteristics of eighteenth-century citizen militia: membership was state-established and defined; it was composed of lay citizens rather than professional soldiers; operations were state-supported; the militia was independent of federal government; and militia forces were dedicated to public rather than private benefit).

¶ 21. The Vermont militia, which was regulated by statute and in which every eligible and nonexempt man was enrolled, was first and foremost a domestic defense force. See Vt. Const. of 1777, ch. II, § 5 (stating that "[t]he freemen of this Commonwealth, and their sons, shall be trained and armed for its defense"), https://sos.vermont.gov/vsara/learn/constitution/1777-constitution/ [https://perma.cc/B937-GMQ2]. "The essential duty of the militia was to be ready to respond, to be called out on a Colonel's orders, 'upon any alarm, invasion, or notice of the appearance of an enemy, either by water or land.' " Gillies, <u>supra</u>, at 15.[10]

¶ 22. A state militia no longer exists. By 1840, the Vermont militia's "glory days were over," and in 1941, "when a revised chapter on the National Guard was enacted . . . the practice of requiring universal manhood military service finally ended for good in Vermont." Gillies, <u>supra</u>, at 16. The core function of the militia is now entrusted to the National Guard, which serves dual

---

[10] Historian Gillies has noted that the militia performed other duties as well. For example, in 1778, ten Vermont militia members were "ordered to march and tread snow from Charlestown, New Hampshire to Wilmington, Vermont, to pack the ground for the sleighs that would follow." Gillies, <u>supra</u>, at 15.

functions as "the militia of the states and a permanent reserve component of the U.S. Army." Uviller, supra, at 538. Although the National Guard is the closest living descendant of the colonial-era militias, it is a distant cousin at best because the federal government controls its weapons and supplies. See Driessen, supra, at 15-17. Moreover, because the government now supplies weapons to members of the National Guard, regulations on firearms do not threaten the effectiveness of the militia. See Davis, 343 N.E.2d at 849. Although modern private armed groups—including, but not limited to, militant white supremacist organizations—may claim the title of a "militia" in name, in practice there is no modern equivalent to the universal, state-regulated militia known to the framers. See Driessen, supra, at 21-22 (distinguishing modern, private "neo-militias," from colonial militias on basis that colonial militias "operated legitimately with the imprimatur of the government sponsoring them"); see also C. Bogus, Race, Riots, and Guns, 66 S. Cal. L. Rev. 1365, 1380-82 (1993) (describing rise of private white-supremacist "militia" groups during Reconstruction and stating that the Ku Klux Klan "continues to expressly invoke the militia tradition").

¶ 23. To the extent that the right to bear arms is tied to the purpose of supporting service in the state militia, this aspect of Article 16 has little meaning in today's world.[11] As one scholar noted about the Second Amendment, "[i]n the year 2000, the militia world contemplated by the Second Amendment no longer exists, and no plausible analogy to that nexus can be reconstructed." Uviller, supra, at 547. In short, the institution of the state militia, with which the right to "bear arms" was associated, is not only distinct from individual self-defense, but has no modern manifestation. For these reasons, the right to "bear arms for the defense . . . of the State" is essentially obsolete. The predicate no longer exists in any meaningful way. But Article 16 goes

---

[11] See People v. Brown, 235 N.W. 245, 246 (Mich. 1931) (noting that state militia was "practically extinct and has been superseded by the National Guard," and therefore "the historical test would render the [Michigan] constitutional provision lifeless").

15

further by expressly stating that "the people" have a right to "bear arms <u>for the defense of themselves</u> and the State."  The textual and historical question is what this additional phrase adds to the meaning of the provision.

c.  "For Defense of Themselves"

¶ 24.    The inclusion of language indicating that the "people" have a right to bear arms "for the defense of <u>themselves</u> and the State" introduces the possibility that the founders intended to establish a broader right to "bear arms" in individual self-defense, unmoored from potential militia service.  Especially in light of the considerations set forth above, the import of the "defense of themselves" language is equivocal.  But the language of Article 16 is not inconsistent with the conclusion that the right to bear arms extends beyond potential militia service to individual self-defense.

¶ 25.    By its plain terms, the language of Article 16 describes a right of "the people" to bear arms for the purpose of defending not only the State, but also "themselves."  This is the strongest evidence that Article 16 was intended to establish a right to bear arms for individual self-defense in addition to defense of the community.  In fact, as noted above, citing this language from the 1777 Vermont Constitution, and the essentially identical provision of the 1776 Pennsylvania Constitution, the United States Supreme Court asserted that these constitutions "clearly adopted individual rights unconnected to militia service."  <u>Heller</u>, 554 U.S. at 601.

¶ 26.    Although the reference to "defense of themselves" lends support to the view that Article 16 establishes a right to bear arms to protect individual interests, the meaning of the text in historical context is equivocal.  The association of the right with "the people," rather than persons, distinguishes it from many, though not all, rights enumerated in the Vermont Constitution that protect individual liberty or action disconnected from the body politic.  The Constitution recognizes that all "persons" are born equally free and independent, and have inherent, unalienable rights, ch. I, art. 1; requires compensation when any "person's" property is taken for public use,

16

id. at art. 2; recognizes freedom of religion for all "persons," id. at art. 3; indicates that every "person" ought to have a remedy at law for injuries or wrongs, id. at art. 4; provides a host of protections to a "person" in prosecutions for criminal offenses, id. at art. 10; provides that no "person" not employed in the army or actual militia service may be subject to martial law, id. at art. 17; and states that no "person" shall be liable to be transported out of state for trial for an offense committed in Vermont, id. at art. 21.

¶ 27.   In contrast, the Vermont Constitution generally refers to "the people" when recognizing rights associated with the body politic, to be exercised collectively.  For example, the rights of governing and regulating the internal police is assigned to "the people," id. at art. 5; government is accountable to "the people," id. at art. 6; free debate and deliberation in the Legislature is essential to the rights of "the people," id. at art. 14; adherence to "justice, moderation, temperance, industry, and frugality" are necessary to preserve the blessings of liberty, and "the people" in directing their legislators and magistrates ought to pay particular attention to these principles, id. at art. 18; and "the people" have a right to assemble and petition the Legislature, id. at art. 20.  But see id. at art. 13 (describing right of "the people" to freedom of speech as a basis for freedom of the press).

¶ 28.   Some Articles include both terms, depending on whether the specific context implicates an individual or collective right or action.  See, e.g., id. at art. 7 (referring to security of "the people" as an end of government, and prohibiting laws for particular emolument or advantage of "any single person, family, or set of persons"); id. at art. 9 (providing that no "person's" property can be taken without consent, protecting rights of any "person" who is conscientiously opposed to bearing arms, and stating that "the people" are not bound by any law they have not assented to for their common good); id. at art. 11 (recognizing the right of "the people" to be free from search or seizure and providing that warrants to seize "any person or persons" without oath and sufficient foundation ought not be granted).

¶ 29. Considering the Declaration of Rights in the Vermont Constitution as a whole, the description of the right to bear arms in Article 16 as belonging to "the people" places it in the category of rights generally associated with and exercised by the body politic as contrasted with rights conferred on and exercised by an individual. See Lohr, 2020 VT 41, ¶ 7 (noting that we consider related provisions in the Constitution as parts of a system); cf. Heller, 554 U.S. at 644-45 (Stevens, J., dissenting) (noting that the words "the people" were generally, though not exclusively, used in the United States Bill of Rights to describe individual rights exercised collectively). For these reasons, the reference to "defense of themselves and the State" in describing the purpose of the right to bear arms is equally compatible with an understanding, reinforced by the historical context described above, that "the people" and "themselves" describe an individual right to bear arms for the purpose of defending the collective body politic, rather than individual persons. Cf. Mich. Const. art. I, § 6 ("Every person has a right to keep and bear arms for the defense of himself and the state." (emphasis added)); Tex. Const. art. 1, § 23 ("Every citizen shall have the right to keep and bear arms in the lawful defense of himself or the State . . . ." (emphasis added)). As a consequence, we cannot conclude with confidence based on the text alone, understood in its historical context, that Article 16 necessarily embodies a right to possess weapons for individual self-defense.

¶ 30. Although the text of Article 16 does not unequivocally establish such a right, our conclusion as to the likely historical meaning of Article 16 does not preclude a right to possess firearms for individual self-defense. Cf. Heller, 554 U.S. at 599 ("It is . . . entirely sensible that the Second Amendment's prefatory clause announces the purpose for which the right was codified: to prevent elimination of the militia. The prefatory clause does not suggest that preserving the militia was the only reason Americans valued the ancient right."). Thus, although the right to bear arms reflected in Article 16 was likely tied to service in the militia, especially given the reference

to defense of "themselves," the Article 16 right may also encompass individual gun ownership for the purpose of private self-defense.

¶ 31. In sum, the text of Article 16, as written in the eighteenth century, was likely designed to protect the right of the people to bear arms for the purpose of constituting and serving in the state militia—a purpose that renders the right essentially obsolete in modern times. However, this interpretation does not foreclose the possibility that the provision can and should be understood to protect the right of individuals to own firearms for individual self-defense, independent of service in a state militia. To help further elucidate the meaning of the constitutional provision, we turn to our case law interpreting Article 16.

2. Vermont Case Law

¶ 32. In this Court's history, we have relied on Article 16 only twice: in State v. Rosenthal, 75 Vt. 295, 297, 55 A. 610, 610 (1903) and State v. Duranleau, 128 Vt. 206, 210, 260 A.2d 383, 386 (1969), superseded by rule on other grounds, V.R.A.P. 5(b), as recognized in State v. Carpenter, 138 Vt. 140, 145, 412 A.2d 285, 289 (1980).[12] Neither case includes a detailed analysis of Article 16. However, both cases offer important insight into how we have historically understood that right: first, we have assumed that Article 16 protects an individual right to bear arms outside of the context of actual or potential militia service, and second, we have assumed that the right is subject to regulation by the Legislature.

¶ 33. Rosenthal, decided in 1903, is our earliest case directly referencing Article 16. In that case, we cited Article 16 in support of our holding that the Rutland city council had exceeded its authority in making an ordinance that no person may carry a pistol without written permission of the mayor or chief of police. 75 Vt. at 299, 55 A. at 610. The ordinance prohibited carrying

---

[12] Other cases have referenced the "right[] of self-defense" as an affirmative defense to a criminal charge. State v. Buckley, 2016 VT 59, ¶ 13, 202 Vt. 371, 149 A.3d 928; see also State v. Wood, 53 Vt. 560, 561 (1881) (quoting charge to jury relating to self-defense). This common-law "right" to self-defense is distinct from the constitutional right to bear arms.

pistols, concealed weapons, and several other specific types of weapons. We first stated that because the city charter did not expressly grant the council power to make such an ordinance, the council could do so only under the charter's general clause, under which an ordinance must not be "repugnant to the Constitution or laws of this state." Id. We then cited the right to bear arms under Article 16, as well as several state statutes that prohibited carrying firearms at school or with the intent of injuring another person. We concluded that the ordinance was repugnant to the Constitution and statutes because it prohibited behavior that was otherwise permitted under Vermont law, and appeared to allow permits for behavior that was otherwise prohibited under Vermont law:

> [U]nless a special permission is granted . . . a person is prohibited from carrying such weapons in circumstances where the same is lawful by the Constitution and the general laws of the state; and there is nothing in the ordinance to prevent the granting of such permission, notwithstanding it be in circumstances to constitute a crime under the general laws. The result is that Ordinance No. 10, so far as it relates to the carrying of a pistol, is inconsistent with and repugnant to the Constitution and the laws of the state, and it is therefore to that extent, void. Whether this renders the whole ordinance illegal, or whether it contains any other invalid provisions, are questions not now before the court.

Id. at 299, 55 A. at 611.

¶ 34. This decision gives us little guidance in interpreting Article 16. Importantly, our reasoning did not rest on the premise that any ordinance or law restricting the use of guns is unconstitutional, or even that the ordinance at issue was unconstitutional. It relied only on the premise that, absent express authorization from the Legislature, a municipality does not have the authority to restrict the right to bear arms under the "general clause" of the city charter in a manner that is inconsistent with state statute or the Vermont Constitution. Id. at 297, 55 A. at 610. Nor does a municipality have the authority to permit the use of firearms where that use is otherwise prohibited by the Legislature. We looked to the Constitution and state statutes as a backdrop against which to determine whether the city council had exceeded its authority. Put simply,

20

Rosenthal was not a constitutional case, even though it relied on the constitution to describe the current state of the law and why the ordinance conflicted with existing law.

¶ 35. However, the decision does reflect the general assumption that the Vermont Constitution protects the individual right to carry firearms outside of the militia context. By citing Article 16 in support of our conclusion that carrying firearms is generally permitted under Vermont law, and stating that an ordinance restricting the individual use of firearms is "repugnant to the Constitution," we suggested that the right to bear arms applied without regard to a connection to state militia service. There is nothing in Rosenthal that suggested the right to bear arms was linked to the militia in any way.

¶ 36. We also assumed that the right to bear arms may be validly restricted by the Legislature. We acknowledged several statutes regulating the use of guns, now codified in Title 13: § 4003 (carrying dangerous weapon with intent to injure another), § 4004 (possessing firearm or dangerous or deadly weapon while on school property), and § 4011 (aiming gun at another). See Rosenthal, 75 Vt. at 297-98, 55 A. at 610. And we confirmed the enforceability of these regulations by holding that the municipality could not enact an ordinance that contravened them. While we did not squarely decide the scope of the Article 16 right or the Legislature's power to regulate gun use, we strongly implied that the individual right to bear arms is protected by the Constitution and can be limited by legislative acts.

¶ 37. The only case in which we have squarely addressed whether a statute is constitutional under Article 16 is Duranleau, 128 Vt. at 210, 260 A.2d at 386. In that case, we rejected a defendant's argument that 10 V.S.A. § 4705(b), which prohibits carrying a loaded rifle or shotgun in a vehicle on a public highway without a permit, violates Article 16. Our analysis was as follows:

> The statute does not literally prohibit the 'bearing' of any arms, but only requires that, when rifles and shotguns are carried in mechanically propelled vehicles on public highways, that they be

21

unloaded. This restriction, even though it relates only to rifles and shotguns, admittedly somewhat conditions the unrestrained carrying and operation of firearms. But the language of the constitutional provision does not suggest that the right to bear arms is unlimited and undefinable. To require that two particular kinds of weapons, at certain specific places and under limited circumstances, be carried unloaded rather than loaded, is not such an infringement on the constitutional right to bear arms as to make the statute invalid. This conclusion is conditioned upon the presumption that the statutory purpose is reasonable, as it must be assumed to be, and on the necessary circumstance that in this case no facts that demonstrate an unconstitutional operation of the statute are before us.

Duranleau, 128 Vt. at 210, 260 A.2d at 386 (citation omitted).

¶ 38. Like our reasoning in Rosenthal, our reasoning in Duranleau reflects the understanding that Article 16 applies to the individual "carrying and operation of firearms," but is subject to regulation. Id. Again, nothing in Duranleau suggests that the right to bear arms is limited to bearing arms in service of a militia—rather, our decision implies that the right belongs to all individuals without regard to potential militia service. And we explicitly held that "the language of the constitutional provision does not suggest that the right to bear arms is unlimited and undefinable." Id. (emphasis added). We made clear that, at least where a regulation only "somewhat conditions" the carrying and operation of firearms, Article 16 does not render firearms regulations invalid. Id. Duranleau also stands for the proposition that restrictions on the right to bear arms, like most statutes, are presumed to be reasonable and valid. See id.; see also State v. Noll, 2018 VT 106, ¶ 21, 208 Vt. 474, 199 A.3d 1054 ("We afford statutes a presumption of constitutionality.").

### 3. Case Law from Sister States

¶ 39. Case law from our sister states, while not binding on us as we interpret the Vermont Constitution, supports the conclusion that the scope of the right to bear arms in Article 16 includes an individual right to possess arms for the purpose of self-defense. Courts in most states with constitutional provisions relating to a right to "bear arms," whether they have constitutional

provisions very similar to Article 16 or substantially different, have concluded that their constitutions protect an individual right to bear arms for self-defense.

¶ 40.    Courts in states with constitutional provisions substantially identical to Vermont's in referencing a right of "the people" to bear arms for "the defense of themselves and the State" have consistently construed these provisions to protect an individual right to bear arms for self-defense.  Considering the scope of its constitutional provision declaring that "[t]he people shall have the right to bear arms for the defence of themselves, and the State," the Oregon Supreme Court reviewed the historical genesis of this language and concluded that the constitutional provision includes, among other things, an individual's right to bear arms "for defense of person and property."  State v. Kessler, 614 P.2d 94, 97-98, 100 (Or. 1980).  On the last point, the court explained, "Although the right to bear arms for self protection does not appear to have been an important development in England, the justification for a right to bear arms in defense of person and home probably reflects the exigencies of the rural American experience."  Id. at 98.

¶ 41.    Similarly, prior to its revision in 1968, the Florida Constitution provided, "The right of the people to bear arms in defence of themselves and the lawful authority of the State, shall not be infringed, but the Legislature may prescribe the manner in which they may be borne."  Fla. Const. of 1885, Declaration of Rights, § 20.[13]  Construing this language, the Florida Supreme Court wrote, "Doubtless the guarantee was intended to secure to the people the right to carry weapons for their protection while the proviso was designed to protect the people also—from the bearing of weapons by the unskilled, the irresponsible, and the lawless."  Davis v. State, 146 So.2d 892, 893-94 (Fla. 1962); see also Schubert v. DeBard, 398 N.E.2d 1339, 1341 (Ind. Ct. App. 1980) (noting that framers' debate over provision in the Indiana Constitution underscores their intent that

---

[13] The current version reads: "The right of the people to keep and bear arms in defense of themselves and of the lawful authority of the state shall not be infringed, except that the manner of bearing arms may be regulated by law."  Fla. Const. art. I, § 8(a).

the provision serve two purposes, including providing citizenry the right to bear arms for self-defense); Lehman v. Pa. State Police, 839 A.2d 265, 273 (Pa. 2003) (implicitly recognizing right to bear arms for purposes unrelated to service in militia, and noting that "[t]he right to bear arms, although a constitutional right, is not unlimited and may be restricted in the exercise of the police power for the good order of society and protection of the citizens" (citation omitted)); Carfield v. State, 649 P.2d 865, 871 (Wyo. 1982) (rejecting defendant's challenge to statute prohibiting felons from possessing firearms on basis that defendant was not contending that his possession was for the purpose of defending the state or himself).

¶ 42.   Moreover, courts in some states with constitutional provisions relating to the right to bear arms that do not include any reference to defense of "themselves," have concluded that their constitutions protect a right to bear arms for individual self-defense.  See, e.g., State v. Bolin, 662 S.E.2d 38, 39 (S.C. 2008) (implicitly concluding that provision that "a well-regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed" protects a right to possess guns outside of the context of military or militia service); see also Heller, 554 U.S. 570 (rejecting view that Second Amendment embodies a right limited to militia service and concluding that local ordinance restricting handgun possession in the home violates Second Amendment).[14]

¶ 43.   Collectively, these decisions reflect a widespread, though not universal, contemporary understanding that bearing arms for self-defense, albeit subject to restrictions, is

_____

[14]   Many state constitutions more explicitly describe a right to bear arms in a way that leaves no question that the right extends to individual self-defense.  See, e.g., Colo. Const. art. II, § 13 ("The right of no person to keep and bear arms in defense of his home, person and property, or in aid of the civil power when thereto legally summoned, shall be called in question; but nothing herein contained shall be construed to justify the practice of carrying concealed weapons."); Conn. Const. art. I, § 15 ("Every citizen has a right to bear arms in defense of himself and the state."); N.H. Const. part 1, art. 2-a ("All persons have the right to keep and bear arms in defense of themselves, their families, their property and the state.").

among the individual rights separately protected by many state constitutions, including those with language similar to Vermont's.[15]

### 4. Historical Regulation of Guns and Militia in Vermont

¶ 44.    Our conclusion that the right to bear arms for individual self-defense is subject to limitations and regulation is consistent with Vermont's history of public-safety regulations of both the militia and individual gun ownership.  Article 16 itself admonishes that "the military should be kept under strict subordination to and governed by the civil power."  Vt. Const. ch. I., art. 16.  And the Vermont Constitution specifically states, "The inhabitants of this State shall be trained and armed for its defense, under such regulations, restrictions, and exceptions, as Congress, agreeably to the Constitution of the United States, and the Legislature of this State, shall direct."  Id. ch. II, § 59.  The militia was not an extralegal entity, and service in the Vermont militia— including firearm specifications and mandatory training—was regulated by state statute beginning in 1778 and by federal statute in 1792.  See Gillies, supra, at 15.  The Legislature frequently revised the militia statute.  Id. at 16.  Some of these regulations were in place to protect the public from militia members: in an overhaul of the statute in 1793, in response to concerns that citizens had been injured on or around training days, the Legislature enacted restrictions on firing guns during those periods.  Id.  Consistent with its purpose, and based on the express terms of the Vermont Constitution itself, the right to bear arms for the defense of the State—that part of Article 16 as to which there is no real dispute—was from the beginning clearly subject to regulation and restriction by the Legislature.  If so, then it follows that the concurrent Article 16 "right to bear arms for the defense of themselves"—which we here explicitly recognize as establishing a right to possess and

---

[15]    The ubiquity of this view is reflected in the State's own defense of the statute in this case.  The State has not questioned that Chapter 1, Article 16, establishes a right to bear arms for the purpose of defending self and home.  The argument that Vermont's Constitution does not protect the right to bear arms for individual defense but instead is "an individual right exercised collectively, through military action, for the common good" was advanced by an amicus curiae in a "friend-of-the-court brief."

use firearms for individual self-defense—is likewise subject to reasonable regulation by the Legislature.

¶ 45. Accordingly, in addition to those militia-related enactments and the regulations discussed in Duranleau and Rosenthal, Vermont has had, and continues to have, numerous firearms-related restrictions. See e.g., 13 V.S.A. § 4004 (prohibiting possession of firearms within a school building or school bus, or on school grounds); id. § 4010 (prohibiting manufacture or importation of gun suppressors); id. § 4011 (prohibiting pointing gun at another "except in self-defense or in the lawful discharge of official duty"); 10 V.S.A. § 4704 (prohibiting use and possession of machine guns and gun suppressors and limiting magazine capacity of autoloading rifles while engaged in hunting), id. § 4705 (prohibiting possession of loaded rifles or shotguns in mechanically-powered vehicles), id. § 4710 (prohibiting discharge of firearm within designated safety zones). Some regulations, including the ban on gun suppressors and the restrictions discussed in Rosenthal, have been in place for over a century. See, e.g., 13 V.S.A. § 4004 (originally enacted as 1892, No. 85, § 2); id. § 4010 (originally enacted as 1912, No. 237); id. § 4011 (originally enacted as 1872, No. 30, §§ 1, 2, 5). Vermont's 1863 gunpowder storage law, which required more than one pound of powder be securely stored in a metal canister, placed a burden on the ability to rapidly prepare and fire multiple rounds of ammunition that is analogous to the magazine limit here. 1863 G.S. 119, § 28. Relative to many other states, Vermont's historical regulation of firearms has been less extensive, but the historical record reflects that even in Vermont, the use of firearms has long been understood to be subject to regulation by the State.

5. Summary Concerning Scope of Article 16 Right to Bear Arms

¶ 46. Much changed in the almost two hundred years between Vermont's adoption of its Constitution in 1777 and our decision in Duranleau in 1969. And much has changed between 1969 and today. The right to bear arms as commonly understood today has little to do with the right to bear arms as understood by the framers. We must bridge the gap between those worlds, and we

do so with the solemn understanding that this debate has had, and will continue to have, life-or-death consequences.

¶ 47.    We conclude that Article 16 protects a right to possess firearms for self-defense.[16] As understood in modern times, this right is tied to the defense of self, family, and home, and is not tied to prospective military use in the context of a state militia. Its scope is accordingly limited. Cf. Kolbe v. Hogan, 849 F.3d 114, 135-36 (4th Cir. 2017) (en banc) (concluding that weapons that are most useful in military service, as opposed to individual self-defense, fall outside ambit of Second Amendment (citing Heller, 554 U.S. at 627)); N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo, 804 F.3d 242, 253 (2d Cir. 2015) ("[T]he Second Amendment protects only those weapons 'in common use' by citizens for lawful purposes like self-defense." (quotations omitted)). Moreover, that right is subject to regulation by statute, under the test discussed below in Part I.B.

¶ 48.    Although not grounded exclusively in the text of Article 16, this interpretation is the best available way to harmonize and honor the core principles of security and self-protection implicit in the right, the individual right to carry guns as implicitly recognized in our case law, and modern persuasive analysis from sister states. See Kirchoff, 156 Vt. at 6, 587 A.2d at 992 ("We do not construe constitutional provisions of this sort the way we do statutes, whose drafters can be expected to indicate with some comprehensiveness and exactitude the conduct they wish to forbid or control and to change those prescriptions when they become obsolete." (quotation omitted)). These considerations, as well as the historical regulation of the right in Vermont, also support our conclusion that the right to bear arms is subject to reasonable regulation pursuant to the State's police power. Whereas we have previously relied on stated or unstated assumptions that the individual right to bear arms in self-defense exists but is not unlimited, we now expressly hold as

---

[16]    Because the regulation at issue here restricts magazines to be used in firearms, we do not address the broader question of whether the right to bear arms in Article 16 encompasses weaponry other than firearms. See, e.g., Kessler, 614 P.2d at 95 (considering constitutionality of law prohibiting possession of "billy" club).

much. And while defendant argues that we should presume a restriction on the right to bear arms is unconstitutional, our case law supports the opposite presumption: we presume the reasonableness and constitutionality of an act of the Legislature, including those that restrict the right to bear arms. See Duranleau, 128 Vt. at 210, 260 A.2d at 386; see also Noll, 2018 VT 106, ¶ 21.

¶ 49. The disconnect between the founders' era and our own is one of the central challenges of constitutional interpretation. As we stated in Baker:

> Out of the shifting and complicated kaleidoscope of events, social forces, and ideas that culminated in the Vermont Constitution of 1777, our task is to distill the essence, the motivating ideal of the framers. The challenge is to remain faithful to that historical ideal, while addressing contemporary issues that the framers undoubtedly could never have imagined.

170 Vt. at 207, 744 A.2d at 874. The framers were preoccupied with the need for domestic defense and the dangers of standing armies; their reality in that respect has little in common with our own. And modern weapons, after two centuries of technological development, are now more lethal and more efficient than the "arms" available to the framers. Given the stark reality of gun violence, subject to the limitations of the Constitution, the Legislature acts within its authority in exercising its inherent power to impose "such reasonable regulations and restraints as are essential to the preservation of the health, safety and welfare of the community." State v. Curley-Egan, 2006 VT 95, ¶ 9, 180 Vt. 305, 910 A.2d 200 (quotation omitted). The next question is: what is the standard for determining whether a regulation impinges on the Article 16 right to bear arms?

B. Standard for Evaluating Constitutionality of Restrictions

¶ 50. In determining the standard for evaluating Article 16 challenges, we first describe the two-part test used by a majority of federal courts and the reasonable-regulation test adopted by a majority of states. We then conclude that the state reasonable-regulation approach is most

consistent with our case law, our interpretation of Article 16, the nature of the right to bear arms, and our constitutional doctrine as a whole.

## 1. Approaches in Other Jurisdictions

¶ 51. The vast majority of jurisdictions apply one of two general tests in right-to-bear-arms cases. Following Heller, 554 U.S. 570, federal courts adopted a two-step test in which they first determine whether a statute burdens Second Amendment rights, then apply either intermediate or strict scrutiny depending on the severity of the burden. The majority of state courts apply the reasonable-regulation test, which is more deferential to the Legislature's judgment and the police power of the state, though a small minority of states apply higher levels of scrutiny.

¶ 52. The Supreme Court in Heller did not specify what standard should apply to challenges under the Second Amendment. That case involved a District of Columbia law that banned handgun possession in the home and required any firearm in the home to be disassembled or bound by a trigger lock at all times. Id. at 628. The Court struck down the law, reasoning that the handgun ban "amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society" for self-defense, and that the requirement that firearms be kept inoperable in the home made it "impossible for citizens to use them for the core lawful purpose of self-defense." Id. at 628, 630. The Court declined to specify the standard that applied to Second Amendment protections, holding instead that "[u]nder any of the [heightened] standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home the most preferred firearm in the nation to keep and use for protection of one's home and family, would fail constitutional muster."[17] Id. at 628-29 (quotations, footnote, and citation omitted).

---

[17] The Court acknowledged that "this law, like almost all laws, would pass rational-basis scrutiny," but stated, "Obviously, [rational-basis scrutiny] could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech, the guarantee against double jeopardy, the right to counsel, or the right to keep and bear arms." Heller, 554 U.S. at 628 n.27.

¶ 53.    Following <u>Heller</u>, the majority of federal circuit courts have developed a two-step framework for addressing Second Amendment claims.  This approach, as the Second Circuit has described, requires courts to first "consider whether the restriction burdens conduct protected by the Second Amendment," and if it does, "determine and apply the appropriate level of scrutiny," generally intermediate or strict scrutiny.  <u>N.Y. State Rifle & Pistol Ass'n</u>, 804 F.3d at 254 & n.49 (collecting cases).[18]

¶ 54.    In deciding under the first prong whether a law burdens conduct protected by the Second Amendment, courts have concluded that some "presumptively lawful regulatory measures" may regulate the use or sale of firearms, but do not affect conduct protected by the Second Amendment.  <u>United States v. Focia</u>, 869 F.3d 1269, 1285-86 (11th Cir. 2017) (quoting <u>Heller</u>, 554 U.S. at 626-27); see also <u>McDonald v. City of Chicago,</u> 561 U.S. 742, 786 (2010) ("We made it clear in <u>Heller</u> that our holding did not cast doubt on such longstanding regulatory measures as prohibitions on the possession of firearms by felons and the mentally ill, laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." (quotations omitted)).  Courts have noted that Second Amendment protections do not apply to " 'dangerous and unusual weapons' " that are not common for lawful purposes, <u>Heller v. District of Columbia</u> (<u>Heller II</u>), 670 F.3d 1244, 1260 (D.C. Cir. 2011) (quoting <u>Heller</u>, 554 U.S. at 627), such as "M-16 rifles" and "weapons that are most useful in military service," <u>Kolbe</u>, 849 F.3d at 135-36 (quoting <u>Heller</u>, 554 U.S. at 627).  And the Second Circuit has held that "heightened scrutiny is

---

[18]  The application of the two-prong test is not universal.  For instance, the Seventh Circuit eschewed the levels-of-scrutiny analysis, noting that levels of scrutiny "do not resolve any concrete dispute," and focused instead on "whether a regulation bans weapons that were common at the time of ratification or those that have some reasonable relationship to the preservation or efficiency of a well regulated militia, and whether law-abiding citizens retain adequate means of self-defense." <u>Friedman v. City of Highland Park</u>, 784 F.3d 406, 410 (7th Cir. 2015) (quotation and citation omitted).  The Eighth Circuit has acknowledged the two-prong test but has not adopted it. See <u>United States v. Hughley</u>, 691 F. App'x 278, 279 n.3 (8th Cir. 2017) (per curiam).

appropriate only as to those regulations that <u>substantially</u> burden the Second Amendment." <u>United States v. Decastro</u>, 682 F.3d 160, 164 (2d Cir. 2012) (emphasis added).

¶ 55. In deciding what level of scrutiny to apply under the second prong of the test, courts typically consider how severely the law restricts the "core" Second Amendment right to self-defense. See, e.g., <u>N.Y. State Rifle & Pistol Ass'n</u>, 804 F.3d at 258 (noting level of scrutiny depends on "(1) 'how close the law comes to the core of the Second Amendment right' and (2) 'the severity of the law's burden on the right' " (quoting <u>Ezell v. City of Chicago</u>, 651 F.3d 684, 703 (7th Cir. 2011))). Within this framework, several courts have suggested that a form of "intermediate scrutiny" is generally more appropriate for gun regulations than strict scrutiny because it "appropriately places the burden on the government to justify its restrictions, while also giving governments considerable flexibility to regulate gun safety." <u>Bonidy v. U.S. Postal Serv.</u>, 790 F.3d 1121, 1126 (10th Cir. 2015); see also <u>Stimmel v. Sessions</u>, 879 F.3d 198, 206 (6th Cir. 2018) (stating that "intermediate scrutiny is preferable in evaluating challenges to [firearms-regulation statute] and similar provisions" (quotation omitted)).

¶ 56. In contrast to federal doctrine, state case law has largely coalesced around a "reasonable regulation" or "reasonable exercise" approach. Of the forty-three states with right-to-bear-arms provisions protecting an individual right, over half have expressly adopted some form of the reasonable-regulation test, and several others have implicitly adopted a similar test. B. Black & K. Kapp, <u>State Constitutional Law as a Basis for Federal Constitutional Interpretation: The Lessons of the Second Amendment</u>, 46 N.M. L. Rev. 240, 251-52 & n.57-58 (2016); see also <u>Benjamin v. Bailey</u>, 662 A.2d 1226, 1233 (Conn. 1995) ("State courts that have addressed the question under their respective constitutions overwhelmingly have recognized that the right [to bear arms] is not infringed by reasonable regulation by the state in the exercise of its police power to protect the health, safety and morals of the citizenry." (collecting cases) (footnote omitted)). A small minority of state courts have applied higher levels of scrutiny under their state constitutions.

See, e.g., <u>Doe v. Wilmington Hous. Auth.</u>, 88 A.3d 654, 666-67 (Del. 2014) (applying intermediate scrutiny); <u>State v. Eberhardt</u>, 145 So.3d 377, 381 (La. 2014) (applying strict scrutiny).[19] And at least one state with constitutional language "substantially identical" to the Second Amendment treats the state constitutional right to bear arms as "co-extensive" with the Second Amendment. <u>DiGiacinto v. Rector & Visitors of George Mason Univ.</u>, 704 S.E.2d 365, 368-69 (Va. 2011).

¶ 57.    Under the reasonable-regulation test, courts "analyze[] whether the statute at issue is a 'reasonable' limitation upon the right to bear arms." <u>Bleiler v. Chief, Dover Police Dep't</u>, 927 A.2d 1216, 1223 (N.H. 2007) (considering whether Legislature had "a reasonable purpose" and "use[d] a reasonable means to achieve [that] purpose"). Although the language used to describe this test is not identical from state to state, courts generally agree that the inquiry centers on whether the statute is a reasonable exercise of the police power. See, e.g., <u>Benjamin</u>, 662 A.2d at 1233-34; <u>Rocky Mountain Gun Owners v. Polis</u>, 2020 CO 66, ¶ 61; <u>Hilly v. City of Portland</u>, 582 A.2d 1213, 1215 (Me. 1990); <u>Mosby</u>, 851 A.2d at 1044. This approach is distinct from rational-basis review because it "demands not just a conceivable legitimate purpose but an actual one." <u>Rocky Mountain Gun Owners</u>, 2020 CO 66, ¶ 56; see also <u>Bleiler</u>, 927 A.2d at 1223 (distinguishing rational-basis test from reasonableness test, which "focuses on the balance of the interests at stake" (quotation omitted)); <u>State v. Cole</u>, 2003 WI 112, ¶ 27, 264 Wis. 2d 520, 665 N.W.2d 328 (same).

---

[19] The constitutions of the two states that apply strict scrutiny to limitations on the constitutional right to bear arms—Louisiana and Missouri—expressly require strict scrutiny of firearms regulations. La. Const. art. I, § 11; Mo. Const. art. I, § 23. Even in these states, courts have recognized that "the fundamental right at issue is one where some degree of regulation is likely to be necessary to protect the public safety." <u>Eberhardt</u>, 145 So.3d at 381; see also <u>State v. Merritt</u>, 467 S.W.3d 808, 814 (Mo. 2015) (en banc) ("It is clear that laws regulating the right to bear arms are not 'presumptively invalid.' ").

## 2. Applicable Standard Under Article 16

¶ 58.   We conclude that the state reasonable-regulation test is the most appropriate standard for Article 16 challenges because it is consistent with our approach in <u>Duranleau</u>, the text and motivating ideals of Article 16, the nature of the right to bear arms, and our previous rejection of rigid "level-of-scrutiny" tests.   Under the reasonable-regulation test, the government may regulate firearms under its police power as long as its exercise of that power is reasonable. Regulation is not reasonable if it effectively abrogates Article 16.   We elaborate on these considerations below.

### a.   Rationale for Adopting Reasonable-Regulation Test

¶ 59.   The reasonable-regulation test is the best approach to evaluating restrictions on the right to bear arms under Article 16 for several reasons.   First, our approach in <u>Duranleau</u> aligns with the reasonable-regulation approach.   We noted that we presumed the regulation was reasonable, which the defendant did not appear to contest in that case.   128 Vt. at 210, 260 A.2d at 386.   And we held that the regulation "admittedly somewhat condition[ed] the unrestrained carrying and operation of firearms," but that it was "not such an infringement on the constitutional right to bear arms as to make the statute invalid."   <u>Id</u>.   We concluded that there were "no facts" demonstrating "an unconstitutional operation of the statute."   This approach is similar to the reasonable-regulation test as described by the New Hampshire Supreme Court in <u>Bleiler</u>: "This test analyzes whether the statute at issue is a 'reasonable' limitation upon the right to bear arms. Such a test . . . 'focuses on the balance of the interests at stake.' "   927 A.2d at 1223 (quoting <u>Cole</u>, 2003 WI 112, ¶ 27).   <u>Duranleau</u> makes clear that a regulation could not permissibly amount to the destruction of the right to bear arms but does not suggest that the State bears the burden of proving that the regulation meets a heightened standard of scrutiny.

¶ 60.   Second, the reasonable-regulation approach best promotes the constellation of ideals underlying Article 16.   It ensures the right to bear arms for self-defense, while recognizing

that the right to bear arms has historically been subject to reasonable restrictions in the discretion of the Legislature. See supra, ¶ 44-45.

¶ 61. Third, the right to bear arms is distinct from other individual rights in the degree to which its exercise is associated with serious risks of harm to self and others. As other states have recognized, "[g]un control legislation . . . is not inherently suspicious" because there is a "compelling state interest in protecting the public from the hazards involved with guns." Bleiler, 927 A.2d at 1222-23 (quotation omitted); see also Cole, 2003 WI 112, ¶ 43 ("Many other states have noted the important safety interests protected by gun control laws"). For that reason, the reasonable-regulation test is "relatively deferential and generally distinct from the type of review that challenges under other constitutional rights receive." Cole, 2003 WI 112, ¶ 23 (quotation omitted). As the Tenth Circuit stated,

> [t]he risk inherent in firearms and other weapons distinguishes the Second Amendment right from other fundamental rights that have been held to be evaluated under a strict scrutiny test, such as the right to marry and the right to be free from viewpoint discrimination, which can be exercised without creating a direct risk to others.

Bonidy, 790 F.3d at 1126.

¶ 62. Finally, while we have often relied on federal case law for guidance in interpreting the Vermont Constitution, we have rejected the "rigid categories utilized by the federal courts under the Fourteenth Amendment," and similarly reject them here. Baker, 170 Vt. at 206, 744 A.2d at 873. In applying the Common Benefits Clause we have adopted " 'a relatively uniform standard, reflective of the inclusionary principle at the Common Benefits Clause's core.' " Badgley v. Walton, 2010 VT 68, ¶ 21, 188 Vt. 367, 10 A.3d 469 (alteration omitted) (quoting Baker, 170 Vt. at 212, 744 A.2d at 878). We likewise reject a tiered approach to evaluating regulations implicating the right to bear arms under Article 16 and adopt a uniform standard for Article 16 cases that reflects the balance of interests at the heart of the right to bear arms.

34

b. The Contours of the Test Under Article 16

¶ 63.    Under the reasonable-regulation balancing test we now adopt, the right to bear arms in self-defense may be "regulated but not prohibited." Rocky Mountain Gun Owners, 2020 CO 66, ¶ 60.[20] This means that the government may regulate firearms as long as any enactment is a reasonable exercise of police power and there is a reasonable fit between the purpose and means of regulation. See id. ¶ 55. Regulation of firearms is not reasonable if it renders Article 16 a nullity. See id. ¶ 56. In applying this test to restrictions on specific firearms, ammunition, or accessories, courts may consider, among other factors, "characteristics of the particular weapon restricted," the "typical use of the proscribed weapon," and the "number and nature of the weapons subjected to the ban [compared] with the number and nature of the weapons that remain available for the vindication of the right." Benjamin, 662 A.2d at 1234.[21]

¶ 64.    The reasonable-regulation test requires the statute to be a reasonable exercise of the police power. The police power in this context "signifies the governmental power of conserving and safeguarding the public safety, health, and welfare." State v. Quattropani, 99 Vt. 360, 363, 133 A. 352, 353 (1926). It derives from the "inherent" power of government to balance the possession and enjoyment of individual rights with "such reasonable regulations and restraints as

---

[20] We reject defendant's assertion that any statutory regulation of the Article 16 right must at the outset be presumed to be invalid or unreasonable. Even those states that hold the right to bear arms is a "fundamental right," and therefore any statutory regulation must pass a higher level of "intermediate scrutiny," recognize that such laws "are not 'presumptively invalid.'" See supra, note 18; see also, e.g., Badgley, 2010 VT 68, ¶¶ 20, 38 (explaining that in considering a statutory "challenge under the Vermont Constitution . . . .[w]e start by emphasizing that statutes are presumed to be constitutional . . . presumed to be reasonable . . . the proponent of a constitutional challenge has a very weighty burden to overcome," and "we must accord deference to the policy choices made by the Legislature").

[21] We do not address in this decision the factors to be considered in determining whether other kinds of provisions potentially impacting the right to bear arms—such as limitations on where individuals can possess firearms, regulations concerning the sale or transfer of firearms, requirements relating to securing or carrying firearms, or limitations concerning who may possess firearms—might constitute unreasonable exercises of the police power or effectively nullify the right to bear arms in defense of home, person, or property.

are essential to the preservation of the health, safety and welfare of the community." Curley-Egan, 2006 VT 95, ¶¶ 9-10 (quotations omitted). "Reasonableness in the exercise of the State's police power requires that the purpose of the enactment be in the interest of the public welfare and that the methods utilized bear a rational relationship to the intended goals." Hilly, 582 A.2d at 1215 (quotation omitted). In assessing reasonableness, therefore, courts should consider the importance of the state's goals, the reasonableness of the connection between the goals and the means chosen, and the degree to which the regulation burdens the exercise of the right to bear arms for self-defense. See Sowma v. Parker, 112 Vt. 241, 249-50, 22 A.2d 513, 517 (1941) ("The test used to determine the constitutionality of the means employed by the Legislature is to inquire whether the restrictions it (police power) imposes on rights secured to individuals by the Bill of Rights are unreasonable and not whether it imposes any restrictions on such rights." (quotation omitted)).

¶ 65.    The test will not tolerate a statute that effectively abrogates Article 16. See Rocky Mountain Gun Owners, 2020 CO 66, ¶ 56 (emphasizing that statute may not "have either a purpose or effect of rendering the right to bear arms in self-defense a nullity"); see also Benjamin, 662 A.2d at 1234 ("The police power cannot . . . be invoked in such a manner that it amounts to the destruction of the right to bear arms." (quotation omitted)).

¶ 66.    This test is not the same as rational-basis review under the U.S. Constitution.[22] Article 16 "stands as an independent, substantive limitation on otherwise rational government action." Rocky Mountain Gun Owners, 2020 CO 66, ¶ 61. The reasonable-regulation test "requires an actual, not just conceivable, legitimate purpose related to health, safety, and welfare."

---

[22]  In fact, in the equal protection context, at least in the context of classifications subject to "rational basis" review under the Equal Protection Clause of the United States Constitution, we have held that the Vermont Constitution may require more rigorous review than the United States Constitution. See Baker, 170 Vt. at 203, 744 A.2d at 871 (describing analysis under Common Benefits Clause as "broadly deferential to the legislative prerogative to define and advance governmental ends, while vigorously ensuring that the means chosen bear a just and reasonable relation to the governmental objective").

Id. It "focuses on the balance of the interests at stake, rather than merely on whether any conceivable rationale exists under which the legislature may have concluded the law could promote the public welfare." Bleiler, 927 A.2d at 1223 (quotation omitted). Although our inquiry looks to an actual balance of interests, rather than merely a conceivable one, it does not override our general deference to the Legislature on matters within its authority. The question for courts is not whether we would strike the same balance as the Legislature, but is whether the Legislature's choices are anchored to a real, as opposed to hypothetical, foundation. And even regulations that would otherwise satisfy that standard may still be unconstitutional if ultimately they render the right at stake a nullity.

## II. Application to 13 V.S.A. § 4021

¶ 67. Applying the reasonable-regulation test to the large-capacity magazine ban, 13 V.S.A. § 4021, we conclude that the statute does not violate the right to bear arms under Article 16. For the purpose of this analysis, we assume without deciding that at least some of the firearms to which such magazines may attach, and at least some of the magazines themselves, are within the general scope of Article 16's protections, subject to reasonable regulation. Cf. N.Y. State Rifle & Pistol Ass'n, 804 F.3d at 257 (assuming without deciding that law banned weapons protected by the Second Amendment where statutes would nonetheless pass constitutional muster). Accordingly, we first consider the purpose of the statute—to reduce the potential harm of mass shootings—and the connection between the regulation imposed and that goal. We next consider the burden on the right to bear arms. We conclude that § 4021 is a reasonable exercise of the State's police power in service of the statute's purpose. and poses a minimal burden on the right to bear arms.

### A. Purpose and Connection

¶ 68. Section 4021 states, "A person shall not manufacture, possess, transfer, offer for sale, purchase, or receive or import into this State a large capacity ammunition feeding device."

13 V.S.A. § 4021(a). A large-capacity ammunition feeding device is defined, with some exceptions, as "a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept: (A) more than 10 rounds of ammunition for a long gun; or (B) more than 15 rounds of ammunition for a hand gun." Id. § 4021(e)(1). The statute provides for imprisonment of up to one year and a fine of up to $500 for those who violate the statute. Id. § 4021(b). It does not apply to possession of large-capacity magazines purchased prior to April 11, 2018, id. § 4021(c)(1), or to large-capacity magazines transferred to or possessed by governmental agencies or law enforcement, id. § 4021(d)(1), in addition to several other exceptions.

¶ 69. The Legislature enacted § 4021 in April 2018, in the wake of a threatened mass shooting in Fair Haven, Vermont. See 2017, No. 94 (Adj. Sess.), §§ 8, 11. On February 14, 2018—the same day a mass shooter killed seventeen people in a high school in Parkland, Florida[23]—the Fair Haven Police Department received a report about a possible threat to Fair Haven Union High School. See State v. Sawyer, 2018 VT 43, ¶ 5, 207 Vt. 636, 187 A.3d 377 (mem.) (reviewing hold-without-bail order), https://www.vermontjudiciary.org/sites/default/files/documents/eo18-105.bail_.pdf [https://perma.cc/88RA-ZNLU]. The suspect, an eighteen-year-old who had attended the school, reportedly told police that he had planned to commit a mass shooting at the school, that "he wanted to exceed the body count from the Virginia Tech shooting and that he had chosen his ammunition accordingly."[24] Id. ¶ 7. In response to this scare, after

---

[23] E. Chuck, A. Johnson & C. Siemaszko, 17 Killed in Mass Shooting at High School in Parkland, Florida, NBC News (updated Feb. 15, 2018, 10:20 AM), https://www.nbcnews.com/news/us-news/police-respond-shooting-parkland-florida-high-school-n848101 [https://perma.cc/576C-NVEC].

[24] See N. Higgins DeSmet, Fair Haven Shooting Threat: 'By the Grace of God' Vermont Avoided Disaster, Burlington Free Press (updated Feb. 23, 2018 3:51 PM), https://www.burlingtonfreepress.com/story/news/2018/02/16/teen-arrested-fair-haven-school-shooting-threat/344409002/ [https://perma.cc/XJ6F-5U2D].

extensive debate and testimony, the Legislature passed, and the Governor signed, several gun-control measures as part of Act 94, including the statute at issue here. See 2017, No. 94 (Adj. Sess.).

¶ 70. Act 94 followed an unusual course through the Legislature. As introduced in 2017, prior to the Fair Haven mass-shooting scare, the bill proposed only "to expand Vermont's territorial jurisdiction over prohibited regulated drug sales." S.55, 2017-2018 Gen. Assem., Adj. Sess. (Vt. 2018) [hereinafter S.55] (bill as introduced), https://legislature.vermont.gov/Documents/ 2018/Docs/BILLS/S-0055/S-0055%20As%20Introduced.pdf [https://perma.cc/2L2M-4V9D]. In February and March of 2018, the Senate expanded the bill and retitled it: "An act relating to the disposition of unlawful and abandoned firearms." S.55 (as passed by Senate), https:// legislature.vermont.gov/Documents/2018/Docs/BILLS/S-0055/S-0055%20As%20passed%20by %20the%20Senate%20Official.pdf [https://perma.cc/RX7P-GZFK]. At that stage, the bill included measures addressing the disposition of unlawful firearms, establishing regulations on the transfer of firearms, and prohibiting the sale of firearms to persons under twenty-one years of age. Id. In the aftermath of the Fair Haven scare, and after extensive testimony in the House Judiciary Committee, the House proposed amendments to add a number of additional restrictions related to firearms, including a prohibition of large-capacity magazines. See S.55 (as proposed by House), https://legislature.vermont.gov/Documents/2018/WorkGroups/Senate%20Judiciary/Bills/S.55/ S.55~Erik%20Fitzpatrick~House%20Proposal%20of%20Amendment~3-30-2018.pdf [https:// perma.cc/XD9B-GQ2N]. After further hearings in the Senate Judiciary Committee, the Senate concurred in the House amendments. S. Jour. 650, 2017-2018 Gen. Assem., Adj. Sess. (Vt. Mar. 30, 2018). With the Governor's signature, the large-capacity magazine ban codified in § 4021 was enacted into law, effective immediately. See S. Jour. 699, 2017-2018 Gen. Assem., Adj. Sess. (Vt. Apr. 12, 2018).

¶ 71.    Although Act 94 did not contain legislative findings or a statement of purpose, we understand from reviewing the legislative record that the purpose of § 4021 is to reduce the number of people who would be killed or injured in a mass shooting in Vermont.  There is no question that reducing the potential for injury and death in the event of a mass shooting is a proper Legislative purpose within the police power.  The Legislature's aim was to prevent catastrophic harm to the people of Vermont—one of its core functions as our lawmaking body.  See United States v. Morrison, 529 U.S. 598, 618 (2000) ("[W]e can think of no better example of the police power . . . than the suppression of violent crime and vindication of its victims."); Kolbe, 849 F.3d at 150 (Wilkinson, J., concurring) ("Providing for the safety of citizens within their borders has long been state government's most basic task.").

¶ 72.    And we conclude that the Legislature acted within its constitutional authority in determining that the limitation on large-capacity magazines furthers this goal.  There is ample support in the public arena for the proposition that the use of large-capacity magazines is correlated with higher numbers of deaths and injuries in mass shootings.  In a report detailing shooting incidents where large-capacity magazines were used, the Violence Policy Center[25] stated, "Large capacity ammunition magazines are the common thread running through most mass shootings in the United States."  Violence Policy Center, Large Capacity Ammunition Magazines, 1 (Feb. 13, 2020),    https://www.vpc.org/fact_sht/VPCshootinglist.pdf    [https://perma.cc/6PTM-PXR8].[26]

_____

[25]  The Violence Policy Center is a national 501(c)(3) that conducts research and education on firearms violence.  Violence Policy Center, https://vpc.org/ [https://perma.cc/LX2B-XR5J] (last visited Jan. 11, 2021).

[26]  It is clear that not all mass shootings involve high-capacity magazines, and it is unknown in some cases precisely what type of magazines were used.  For instance, an initial Public Safety Commission report of the Parkland shooting reported that "[e]ight 30- and 40-round capacity magazines were recovered from the scene," Marjory Stoneman Douglas High School Public Safety Commission, Initial Report 262 (Jan. 2, 2019), http://www.fdle.state.fl.us/MSDHS/ CommissionReport.pdf [https://perma.cc/L6PN-7UCV], but at least one court has credited evidence that the shooter used only ten-round magazines, see Duncan v. Becerra, 366 F. Supp. 3d

There is extensive evidence that "the use of LCMs in mass shootings increases the number of victims shot and the fatality rate of struck victims." Rocky Mountain Gun Owners, 2020 CO 66, ¶ 64. "The more rounds a shooter can fire consecutively, the more gunshot wounds they can inflict during an attack." Giffords Law Center, Large Capacity Magazines, https://lawcenter.giffords.org/gun-laws/policy-areas/hardware-ammunition/large-capacity-magazines/ [https://perma.cc/6CJH-KJSE]. One study by an advocacy organization found that of the sixty-eight mass shootings between 2009 and 2018 where magazine size was known, those that involved the use of large-capacity magazines led to five times the number of people shot per mass shooting compared to mass shootings that did not involve the use of large-capacity magazines. Everytown for Gun Safety, Mass Shootings in America (Nov. 21, 2019), https://maps.everytownresearch.org/massshootingsreports/mass-shootings-in-america-2009-2019/#foot_note_anchor_15 [https://perma.cc/FAZ5-ZD98]. Specifically, large-capacity magazines led to over twice the number of deaths and over fourteen times the number of injuries. See id. (comparing average of 10 deaths and 17.2 people injured in mass shootings involving high-capacity magazines, and average of 4.6 deaths and 1.2 people injured in mass shootings involving smaller magazines).

¶ 73. The research on this subject is not limited to advocacy organizations publishing nonpeer-reviewed analyses. A scholar at George Mason University reviewed data from multiple sources concerning impact of large-capacity magazine firearms in mass shootings and found that high-capacity semiautomatic weapons are used in between 20% and 58% of all firearm mass murders, and in a particularly high share of public mass shootings. C. Koper, Assessing the Potential to Reduce Deaths and Injuries from Mass Shootings Through Restrictions on Automatic Weapons and Other High-Capacity Semiautomatic Firearms, 19 Criminology & Pub. Pol'y 147,

---

1131, 1161 (S.D. Cal. 2019). We will not engage in fact finding as to the specifics of any given mass shooting; the Legislature had clear evidence from the available data that large-capacity magazines are associated with many of the deadliest shootings in the United States.

147 (2020). Koper reported that average fatalities are 38% to 85% higher, and total victims killed or wounded are two to three times higher when LCMs are used. Id. at 152.

¶ 74.    Substantial available data supports the conclusion that bans on large-capacity magazines may be effective in reducing the fatalities and injuries in the event of a mass shooting. Large-capacity magazine bans "reduce[] the number of shots that can be fired from one gun, making numerous injuries less likely." Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Attorney General N.J., 910 F.3d 106, 119 (3d Cir. 2018). Some studies have suggested that the 1994-2004 federal ban on assault weapons and high-capacity magazines reduced the number of mass-shooting deaths. See J. Lowy, Comments on Assault Weapons, The Right to Arms, and the Right to Live, 43 Harv. J.L. & Pub. Pol'y 375, 382-83 (2020) (citing studies). In the Koper study described above, Koper reviewed comparisons of mass shootings with and without LCM firearms and concluded that LCM restrictions could potentially reduce total fatalities by 11% to 15%, and total injuries by 24% to 26% across all firearm mass-murder incidents. Koper, supra, at 153. Focusing particularly on public mass shootings, he cautiously projected that total deaths and injuries could potentially decline in these cases by somewhere between one-third and one-half. Id. at 153-54. Koper concluded that restrictions on assault weapons and LCMs "are not a complete solution for the problem of mass shootings or public mass shootings more specifically"; nevertheless, "they are modest policy measures that can likely help to reduce the incidence and severity of mass shootings over time." Id. at 163.

¶ 75.    Similarly, a group of scholars at Johns Hopkins University analyzed data from the FBI and other publicly available databases to calculate state-level annual incidence of fatal mass shootings from 1984-2017. See D. Webster et al., Evidence Concerning the Regulation of Firearms Design, Sale, and Carrying on of Fatal Mass Shootings in the United States, 19 Criminology & Pub. Pol'y 171 (2020). After performing a statistical analysis of the association between fatal mass shootings and these gun laws, they concluded that bans of large-capacity

42

magazines were one of two policies associated with reductions in the incidence of fatal mass shootings. Id. at 187; see also L. Klarevas et al., The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990-2017, 109 Am. J. Pub. Health 1754, 1758-60 (2019) (analyzing 69 high-fatality mass shootings from 1990 to 2017, finding that incidence of high-fatality mass shootings was more than double and annual number of deaths more than three times higher when comparing non-LCM ban states to LCM ban states, with similar results in multivariate analyses, and ultimately concluding that LCM bans appear to reduce both incidence of, and number of people killed in, high-fatality mass shootings).

¶ 76. Reports from actual mass shooting events suggest that a ban on large-capacity magazines could create opportunities for victims to flee or intervene in the event of a mass shooting. See Ass'n of N.J. Rifle & Pistol Clubs, Inc., 910 F.3d at 119 (stating that ban "will present opportunities for victims to flee and bystanders to intervene"); Rocky Mountain Gun Owners, 2020 CO 66, ¶ 64 ("[T]he pause created by the need to reload or replace a magazine creates an opportunity for potential victims to take life-saving measures."). For instance, at least one court has noted that at the 2012 Sandy Hook Elementary School shooting in Newtown, Connecticut, "[n]ine terrified children ran from one of the classrooms when the gunman paused to reload, while two youngsters successfully hid in a restroom." Kolbe, 849 F.3d at 120; see also People Threw Barstools Through Window to Escape Thousand Oaks, California, Bar During Shooting, USA Today (Nov. 8, 2018), https://www.usatoday.com/story/news/nation-now/2018/11/08/thousand-oaks-bar-shooting-people-broke-windows-stools-escape/1928031002/ [https://perma.cc/2VKH-ZHAU] (reporting that as gunman reloaded, bystanders threw barstools through window and "shuffle[d] as many people out as possible"). And bystanders have stopped mass shootings by intervening when the shooter pauses to reload. See Ass'n of N.J. Rifle & Pistol Clubs, 910 F.3d at 113; see also M. Stevens, Man Who Wrested Rifle from Waffle House Gunman Raises $227,000 for Victims, N.Y. Times (May 7, 2018), https://www.nytimes.com/2018/05/07/

us/waffle-house-hero-victims.html [https://perma.cc/3BW2-E6JK]. "[L]imiting a shooter to a ten-round magazine could mean the difference between life and death for many people." Kolbe, 849 F.3d at 128 (quotation omitted).

¶ 77.    Other courts have recognized the potential public-safety impacts of large-capacity magazine bans.    See, e.g., Worman v. Healey, 922 F.3d 26, 40 (1st Cir. 2019) ("[T]he Massachusetts legislature's conclusion that the Commonwealth's legitimate interests are best served by proscribing semiautomatic assault weapons and LCMs rests on substantial (although not incontrovertible) evidence regarding the inordinate dangers associated with the proscribed weapons"); N.Y. State Rifle & Pistol Ass'n, 804 F.3d at 263-64 ("[L]arge capacity magazines result in more shots fired, persons wounded, and wounds per victim than do other gun attacks." (quotation omitted)); Friedman v. City of Highland Park, 784 F.3d 406, 411 (7th Cir. 2015) ("A ban on assault weapons and large-capacity magazines might not prevent shootings in Highland Park (where they are already rare), but it may reduce the carnage if a mass shooting occurs."); Heller II, 670 F.3d at 1264 (stating that "evidence demonstrates that large-capacity magazines tend to pose a danger to innocent people and particularly to police officers" who may take advantage of shooter's pause to reload).

¶ 78.    In addition to its potential impacts in the event of a mass shooting, § 4021 has the effect of creating a greater sense of security among the public.  While this effect and purpose alone may not be sufficient to survive scrutiny under Article 16, it nevertheless is meaningful to the wellbeing of people of Vermont, particularly children. Mass shootings are "highly salient" events and cause significant stress for both adults and teenagers.[27]  Friedman, 784 F.3d at 412.  The

_____

[27] The American Psychological Association reported that 75% of those between the ages of 15 and 21 and 62% of adults overall felt stressed by mass shooting events.  Am. Psychological Ass'n, Stress in America: Generation Z (Oct. 2018) https://www.apa.org/news/press/releases/stress/2018/stress-gen-z.pdf [https://perma.cc/S76N-7699].  Similarly, according to the Pew Research Center, 57% teens in the United States reported

legislative record includes a number of communications from Vermonters describing the impact of the potential for mass shootings on children and teenagers in Vermont. As the Seventh Circuit recognized, "If a ban on . . . large-capacity magazines reduces the perceived risk from a mass shooting, and makes the public feel safer as a result, that's a substantial benefit." Id.

¶ 79. We do not recount the above evidence because this Court necessarily concurs with the Legislature's assessment that the limit on large-capacity magazines will in fact substantially reduce the risks and harms of mass shootings, or to signify that we credit the above accounts, studies, and arguments, and discount the thoughtful analyses and arguments of those opposed to the legislation. Rather, we recite the above to explain our conclusion that the Legislature had ample information, facts, and data, either actually in-hand or available in the public arena, to support its conclusion that the limit on large-capacity magazines will have an appreciable impact in reducing the injuries and fatalities in the event of mass-shooting events. In the face of this support and in the absence of a showing that § 4021 imposes a disproportionate burden on the Article 16 right, which we discuss next in Part B, the Legislature's policy determination that the LCM limit at issue is a reasonable regulation is within its constitutional authority, and we will not set it aside.

¶ 80. When it enacted § 4021, the Legislature did not formally make any legislative findings, and we cannot determine what facts and information in the record it found most persuasive. Legislative findings can be helpful, but are not required. We can and do evaluate the constitutionality of legislation under the Vermont Constitution in the absence of an express

---

that they were "very worried" or "somewhat worried" about the possibility of a shooting at their school, and the same was true for 63% of parents. N. Graf, A Majority of U.S. Teens Fear a Shooting Could Happen at Their School, and Most Parents Share Their Concern, Pew Research Center (Apr. 18, 2018), https://www.pewresearch.org/fact-tank/2018/04/18/a-majority-of-u-s-teens-fear-a-shooting-could-happen-at-their-school-and-most-parents-share-their-concern/ [https://perma.cc/477R-L7T2]. Concern was greater among Black and Hispanic teens and parents as well as lower-income parents. Id.

statutory statement of the legislative basis or intent. See, e.g., <u>Baker</u>, 170 Vt. at 198-201, 216-18, 221-23, 744 A.2d at 881-82, 883-85 (purpose of Vermont "marriage laws" determined from text itself, historical context, and "common understanding" reflected by statutes read as a whole, and not from express statements of the Legislature at time of enactment); see also <u>Badgley</u>, 2010 VT 68, ¶¶ 23, 40 (holding "governmental purpose" of statute imposing mandatory retirement of State public-safety employees at age 55 was "proffered" by State and identified during litigation, and not derived from any express legislative statement because there was "no evidence of the legislative record"). And we cannot glean from the record what factors the Legislature relied on because ultimately the legislators act collectively through a binary vote ("yea" or "nay"); individual legislators may have assessed the information before them differently. That is a defining feature of representative democracy: we trust our elected representatives to reflect the "common understanding" of the community, and to use their best judgment to make decisions on our behalf, without requiring them to describe the specific weighing of factors that underlay their votes.

¶ 81. For these reasons, we reject any suggestion that the facts and information available to or relied upon by the Legislature, or by us in reviewing the statute's constitutionality, must be "evidence," of a sort that would be admissible in a court proceeding under the Vermont Rules of Evidence, that necessarily proves what it purports to establish. Although we will not uphold a law restricting the right to bear arms on the basis of hypothetical rationales for which there is no basis, or which are overwhelmingly refuted by contrary evidence,[28] Vermont courts will not second-guess the Legislature's weighing of the facts and information supporting its enactments when its

---

[28] Again, we use the term "evidence" here in its broadest sense to denote information, facts, and data actually presented to the Legislature or available to it from the public sphere, as well as testimony (whether or not under oath) and statements to the Legislature (or individual legislators or legislative committees), all of which is available to us for consideration.

legislation is supported by adequate evidence in light of the constitutional rights potentially implicated by its legislation.

## B. Burden on Right to Bear Arms

¶ 82.    The available evidence supports the Legislature's conclusion that a large-capacity magazine ban does not significantly impair the right to bear arms for self-defense.  Section 4021 does not prevent Vermonters from buying or using the gun of their choice—it restricts only the capacity to shoot more than ten or fifteen rounds at a time, and thus places minimal restriction on their ability to bear arms in self-defense.  Additionally, in contrast to their ubiquity among mass shootings, large-capacity magazines appear to be rarely used for self-defense purposes.  Therefore, the large-capacity magazine ban does not render Article 16 a nullity.  Our conclusion on this point is in line with the recent decision by the Colorado Supreme Court and almost all federal circuits to have considered a large-capacity magazine ban.

¶ 83.    Section 4021 restricts only magazine capacity.  It does not purport to restrict the use of firearms that accept large-capacity magazines.  The Legislature has chosen not to restrict individuals' choice of firearms for self-defense or other purposes, but instead has sought to curb the potential of those weapons to inflict large-scale harm.  It has done this by "set[ting] a limit on the number of rounds that can be fired before a shooter needs to reload."  Rocky Mountain Gun Owners, 2020 CO 66, ¶ 64; see also Worman, 922 F.3d at 37 (noting that large-capacity magazine ban proscribed only "magazines of a particular capacity").  A prohibition of this sort "does not effectively disarm individuals or substantially affect their ability to defend themselves."  Ass'n of N.J. Rifle & Pistol Clubs, Inc., 910 F.3d at 118.  It limits access to "one tool—magazines that hold over ten rounds."  Id. at 122.

¶ 84.    And it appears from the available data that the tool—the large-capacity magazine— is almost never used for self-defense.  The average number of shots fired in self-defense between 1997 and 2001, and 2011 to 2013, has been estimated to be 2.2 or fewer.  Kolbe, 849 F.3d at 127

(relying on "[s]tudies of 'armed citizen' stories collected by the National Rifle Association"); see also Worman, 922 F.3d at 37 (noting lack of evidence of any self-defense episode where ten or more shots were fired); N.Y. State Rifle & Pistol Ass'n, 804 F.3d at 260 (noting that large-capacity magazine ban does not "substantially affect [individuals'] ability to defend themselves" (quotation omitted)). Amicus curiae Cato Institute points to two incidents in which women in Georgia and Michigan successfully used firearms to fend off home invaders, but the news reports Cato relies on reflect that the women shot six and four times, respectively, undermining any suggestion that in these instances the women's self-defense relied on the capacity to shoot more than fifteen rounds from their respective handguns. See H. Fournier, Woman Fires at Home Burglars: "I Let Loose on Them," Detroit News (June 9, 2015), https://www.detroitnews.com/story/news/local/detroit-city/2015/06/09/woman-hospital-gunfight-home-invaders/28727561/ [https://perma.cc/SZF9-QEMY]; R. Phillips, Gun Rights Groups Say Georgia Home Invasion Proves Their Point, CNN (Jan. 11, 2013), https://www.cnn.com/2013/01/10/us/home-invasion-gun-rights/index.html [https://perma.cc/9F5R-PZTX]. While a large-capacity magazine could conceivably be used for self-defense purposes, and no doubt has on some occasion somewhere, neither defendant, nor Cato nor any other amicus, has provided an example of such an occurrence despite analysis of defensive shootings over more than two decades.[29] To the extent the ban on large-capacity magazines infringes on the right to bear arms at all, the burden is not disproportionate, and the restriction does not render Article 16 a nullity.

---

[29] Again, we do not decide here whether the estimate of "2.2 shots" for self-defense is in fact correct, but simply acknowledge that it is a significant, relevant, and widely accepted data point that supports the Legislature's conclusion that the LCM prohibition does not unreasonably nullify Vermonters' right to self-defense. Even if that specific statistic is genuinely contested, it is still true that no one has come forward with even anecdotal examples of any LCM being necessary for individual self-defense.

48

¶ 85.   This conclusion is consistent with the Colorado Supreme Court's recent decision in Rocky Mountain Gun Owners, 2020 CO 66.  That case concerned a ban on magazines of fifteen rounds or more.  Id. ¶ 6.  Evaluating the constitutionality of the ban under the Colorado Constitution, the court concluded that "the evidence overwhelmingly demonstrated the reasonableness" of the ban on large-capacity magazines, and it rejected plaintiffs' argument that the ban applied to the "overwhelming majority of magazines" and therefore rendered the right to bear arms a nullity.[30]  Id. ¶¶ 64-65.

¶ 86.   All but one federal circuit court to have considered a large-capacity magazine ban have also upheld such bans, often alongside bans on assault rifles.  The Fourth Circuit determined that large-capacity magazines are not protected by the Second Amendment, and therefore upheld the regulation at the first step of the federal two-step test.  Kolbe, 849 F.3d at 133.  The First, Second, Third, and D.C. Circuits all assumed without deciding that large-capacity magazines were protected by the Second Amendment, concluded that intermediate scrutiny applied to the restrictions, and upheld the statutes applying that standard.  See Worman, 922 F.3d at 36, 39; Ass'n of N.J. Rifle & Pistol Clubs, 910 F.3d at 117, 122; N.Y. State Rifle & Pistol Ass'n, 804 F.3d at 257, 264; Heller II, 670 F.3d at 1261.  The Seventh Circuit applied a slightly different test to reach the same conclusion.  Friedman, 784 F.3d at 410-12; see also Wilson v. Cook County, 937 F.3d 1028, 1034 (7th Cir. 2019) (declining to revisit Friedman and summarizing its holding that "because the Highland Park Ordinance did not strike at the heart of the Second Amendment, and because the residents of Highland Park were not left without a means of self-defense, the Constitution did not foreclose Cook County's efforts to preserve public safety").

¶ 87.   The Ninth Circuit is the only federal circuit to strike down a large-capacity magazine ban under the Second Amendment.  Duncan v. Becerra, 970 F.3d 1133, 1140 (9th Cir.

---

[30]  The plaintiffs' latter argument rested on their interpretation of the specific Colorado statute at issue.  Id. ¶ 65.

49

2020). <u>Duncan</u> involved a challenge to California's large-capacity magazine ban, which applied to magazines of ten rounds or more. <u>Id</u>. The court noted that magazines of more than ten rounds are common and come standard with many firearms, making them similar to the handguns at issue in <u>Heller</u>, 554 U.S. at 629; that the law was broad in that it "operates as a blanket ban on all types of LCMs everywhere in California for almost everyone"; and that the law no longer contained a grandfather clause. <u>Id</u>. at 1142, 1167. For those reasons, the court determined that the statute placed a substantial burden on the core of the Second Amendment right, and it evaluated the statute under a strict-scrutiny standard. <u>Id</u>. at 1164-65. The court concluded that although the governmental interest in reducing the harm of gun violence was compelling, the law was not narrowly tailored to achieve that interest. <u>Id</u>. It added that in its view, the statute would fail even intermediate scrutiny. <u>Id</u>. at 1167-68.

¶ 88. Defendant and amici urge us to adopt similar reasoning here. They argue that there has been "common possession of repeat arms" in this state since the Constitution was enacted, that magazines of more than ten or fifteen rounds are as common now as the handguns at issue in <u>Heller</u>, and therefore that banning them for self-defense purposes is categorically unconstitutional. We decline to adopt this reasoning for two reasons. First, we are not bound by the Supreme Court's decision in <u>Heller</u> in interpreting the Vermont Constitution. See <u>Badger</u>, 141 Vt. at 448-49, 450 A.2d at 347; <u>supra</u>, ¶¶ 13-14 & n.8. Second, and more importantly, our test does not turn on the popularity of a weapon. Assuming that large-capacity magazines are, as one amicus curiae argues, "common to the point of ubiquity," the number of magazines in circulation is not itself a reason to strike down this law. The proper test is whether the restriction is a reasonable exercise of police power. As long as the statute leaves available to Vermonters reasonable means to exercise the right to bear arms in self-defense, we will not question the Legislature's reasonable policy judgments based on the prevalence of a weapon alone.

50

¶ 89.    For all of these reasons, we find no constitutional infirmity in § 4021 on the grounds defendant advances, and affirm the trial court's denial of defendant's motion to dismiss.

Affirmed.

BY THE COURT:

_____
Beth Robinson, Associate Justice


_____
Karen R. Carroll, Associate Justice


_____
John P. Wesley, Superior Judge (Ret.),
Specially Assigned


_____
Dennis R. Pearson, Superior Judge (Ret.),
Specially Assigned